

DA 10-0027

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2010 MT 151

IN RE THE GRANDPARENT-GRANDCHILD CONTACT OF

SHARON K. SNYDER,

        Petitioner and Appellee,

   v.

TANYA N. SPAULDING,

        Respondent and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DR 07-943
Honorable Gregory R. Todd, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Benjamin J. LaBeau, LaBeau Law Firm, L.L.C., Billings, Montana

        For Appellee:

            Kevin T. Sweeney, Attorney at Law, Billings, Montana

                 Submitted on Briefs:  May 18, 2010

                      Decided:  July 13, 2010

Filed:

        _____
                         Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 This is an appeal from the decision of the Thirteenth Judicial District Court, Yellowstone County, reaffirming previously ordered contact between two minor children and their paternal grandmother over the objection of the children's mother. We reverse and remand for further proceedings.

## BACKGROUND

¶2 Sharon K. Snyder is the paternal grandmother of W.B.S. and D.C.S. Tanya N. Spaulding is the children's mother. Their father (Sharon's son) is deceased. Sharon commenced the instant action in September 2007 by filing a petition for grandparent visitation pursuant to § 40-9-102, MCA (grandparent-grandchild contact). Tanya initially objected to Sharon's request for contact with the children; however, "with misgivings," she eventually entered into a stipulation with Sharon under which Sharon would be allowed specified periods of contact with the children (alternating Saturdays, three days during Christmas/winter break from school, and one week during the summer). The District Court entered an order adopting the stipulation on May 27, 2008. Notably, the case had not yet proceeded to a hearing on the merits of Sharon's petition, and neither the stipulation nor the District Court's order recites any of the findings specified in § 40-9-102, MCA, except that "it serves the best interests of the children for there to be grandparent/grandchild contact as permitted by § 40-9-101, et seq., MCA."

¶3 Fifteen months later, in August 2009, Tanya terminated contact between Sharon and the children. According to Tanya, a number of factors led to this decision. First, she had recently seen a manuscript, written by Sharon about her own life, which Tanya found

2

greatly disturbing.  In it, Sharon expressed the view that W.B.S. is a "crystal child" who has "healing hands" and can "see the future."[1]  In a letter to Tanya, Sharon suggested that Tanya, "as a responsible parent," should see to it that W.B.S. receives all the help he can get as he grows in his abilities.  Sharon also suggested that she (Sharon) was the person to provide W.B.S. with the help and guidance he needs.  These beliefs conflicted with Tanya's beliefs as a Jehovah's Witness.  Second, Tanya felt that Sharon was discrediting Tanya's family beliefs and interfering with Tanya's parenting of the children.  Tanya stated that Sharon was instilling certain views in the children against Tanya's express wishes.  Moreover, Tanya believed that Sharon was encouraging the children to be deceptive toward Tanya, and she noted that W.B.S. was hostile and distant toward her following his visits with Sharon.  Lastly, Tanya cited Sharon's "mental health issues," and in this regard, she pointed to Sharon's claim in the manuscript that she (Sharon) had been reborn as a different person with a different name and memories.  Tanya concluded that Sharon should not be around the children and that contact between Sharon and the children was not in the children's best interests.  Tanya thus decided to terminate the contact previously stipulated to.

---

[1] Crystal children, also known as indigo children, were first described in the 1970s by a San Diego parapsychologist who noticed the emergence of children with an indigo aura, a vibrational color she had never seen before.  This color, she reasoned, coincided with a new consciousness.  *See* John Leland, *Are They Here to Save the World?* N.Y. Times (Jan. 12, 2006).  Indigo children are said to have high IQs, acute intuition, and special abilities—e.g., the ability to read minds, predict the future, and bend silverware through sheer brainpower—and they are believed by some to play a significant role in human evolution, although skeptics argue that this is simply New Age credulity and "a sham diagnosis" for authority-resistant, disruptive, impatient, and easily bored children. *See id.*; Sharon Jayson, *Indigo Kids:  Does the Science Fly?* USA Today (posted May 31, 2005; updated June 1, 2005); Jesse Hyde, *Little Boy Blue* Dallas Observer (Mar. 9, 2006).

¶4 To that end, Tanya filed a motion in the District Court on September 14, 2009, to terminate the court-ordered contact between Sharon and the children. Sharon then filed a cross-motion for contempt, claiming that Tanya had violated the May 2008 stipulation by suspending all contact "without sufficient justification." In response to this claim, Tanya asserted that her constitutional right to parent and protect her children gave her authority to remove the children from "a harmful situation" and that the court should not punish her or interfere with her decision as a parent in doing what she believed was best for her children. The District Court held a hearing in December 2009, at the conclusion of which it denied Tanya's motion to terminate and held her in contempt of the court's May 27, 2008 order adopting the stipulation. The court noted, though, that Tanya "can purge that contempt by honoring the stipulation and order."

¶5 In denying Tanya's motion, the District Court concluded that she had not met her burden. There was some uncertainty by all involved, however, as to the applicable law and the showing that had to be made. Section 40-9-102, MCA,[2] sets out the procedures to be followed, the burdens of proof, and the showings to be made with regard to an initial petition for grandparent-grandchild contact. However, neither this statute nor any other statute in Title 40, chapter 9, MCA, purports expressly to address modifications to or terminations of previously entered orders for such contact (with one exception not applicable here, *see* § 40-9-102(7), MCA). Thus, Tanya argued that the court should simply follow the framework of § 40-9-102, MCA, since this statute lists the factors that are relevant in determining whether grandparent-grandchild contact is appropriate.

[2] Statutory references are to the 2009 Montana Code Annotated.

Sharon, however, suggested that the court should apply § 40-4-219, MCA, which is applicable to amendments of parenting plans. This statute provides, in relevant part, that a court may amend a prior parenting plan "if it finds, upon the basis of facts that have arisen since the prior plan or that were unknown to the court at the time of entry of the prior plan, that a change has occurred in the circumstances of the child and that the amendment is necessary to serve the best interest of the child." Section 40-4-219(1), MCA. Sharon thus argued that Tanya had to show that something had happened after the signing of the stipulation, or that something had come to light that was unknown at the time the stipulation was signed, which triggered or necessitated a modification to the stipulation.

¶6    The District Court disagreed with Tanya's approach, reasoning that § 40-9-102, MCA, was inapplicable because a contact arrangement was already in place. Instead, the court essentially followed Sharon's approach. The court agreed that events occurring prior to the stipulation, as well as the parties' intentions upon entering into the stipulation, were irrelevant. The court posited that the stipulation was a "contract," which Tanya had "breached," and that the issue was whether the contract should now be modified due to new circumstances. Ultimately, the court concluded that Tanya had not carried the burden imposed by § 40-4-219, MCA, to show that an amendment was warranted. The court emphasized several times that Tanya had not established a "cause and effect" between Sharon's conduct and any harm to the children. It is apparent from the court's reasoning that it believed Tanya had to show demonstrable harm to the children as a result of their contact with Sharon before a modification would be warranted. The court

did not consider the presumption in favor of a fit parent's wishes. *See* § 40-9-102(4), MCA. Indeed, the court did not address whether Tanya is a "fit" parent under § 40-9-102(2), MCA, nor did it give any special weight to Tanya's determination of her children's best interests. To the contrary, the court discounted Tanya's concerns relating to Sharon as mere "speculation" and "innuendo," and the court basically chalked up their dispute to "religious beliefs mixed up with family feuds" and "an incredible amount of family dysfunction and accusations and simmering hatred."

¶7 The District Court entered an order on December 30, 2009. As noted, the court denied Tanya's motion to terminate the stipulation and held her in contempt of the court's May 27, 2008 order adopting the stipulation, though the court stated that she could purge this contempt by complying with the court's order for grandparent-grandchild contact. Tanya now appeals.

## ISSUE AND STANDARD OF REVIEW

¶8 Although Tanya articulates a number of issues, we conclude that the following issue (restated here) is dispositive: Did the District Court apply an incorrect standard for evaluating a parent's request to modify or terminate an order for grandparent-grandchild contact? We review for correctness a district court's interpretation and application of statutes. *In re T.H.*, 2005 MT 237, ¶ 35, 328 Mont. 428, 121 P.3d 541.

## DISCUSSION

¶9 At the outset, we do not agree that the May 2008 stipulation was a "contract" that Tanya "breached." The stipulation merely served as "[a] voluntary agreement between opposing parties concerning some relevant point," *Black's Law Dictionary* 1455 (Bryan

6

A. Garner ed., 8th ed., West 2004), which the District Court in turn adopted as the disposition of Sharon's petition for grandparent-grandchild contact. Hence, contract principles concerning breach, remedy, and rescission do not govern here. Rather, the issue is simply whether the court's May 27, 2008 order providing for contact between Sharon and the children should be modified or terminated.

¶10 In this regard, the District Court erred in relying on § 40-4-219, MCA. For one thing, this statute governs amendments to parenting plans adopted in the context of marriage dissolutions; and here, Sharon is not the children's "parent"[3] and the court's May 27, 2008 order does not constitute a "parenting plan," *see* § 40-4-234(2), MCA. But more importantly, it is not appropriate to simply import wholesale into the context of *grandparent-grandchild contact* the standards and procedures that govern the allocation of *parenting* functions upon a dissolution of marriage. In the latter context, the central issue is the division of parenting responsibilities between the parents, whereas in the former context, the issue is contact between a child and a nonparent over the parent's objection. This is a critical distinction. Both parties to a "parenting plan" are "parents";

---

[3] A "parent" is "[t]he lawful father or mother of someone," which "commonly includes (1) either the natural father or the natural mother of a child, (2) the adoptive father or adoptive mother of a child, (3) a child's putative blood parent who has expressly acknowledged paternity, and (4) an individual or agency whose status as guardian has been established by judicial decree." *Black's Law Dictionary* 1144. The Montana Code Annotated contains similar definitions. *See e.g.* §§ 20-5-501(4)(e), 40-5-201(10), 40-5-804(10), 40-6-501(4)(e), 40-6-601(2)(b), 41-3-102(16), 41-5-103(32), 42-1-103(14), MCA; *see also* § 40-4-211(6), MCA (defining "child-parent relationship"); § 40-4-234(1), MCA (defining "parenting functions"). In addition, § 40-4-228, MCA, provides that a nonparent may obtain a parental interest in a child. *See Kulstad v. Maniaci*, 2009 MT 326, 352 Mont. 513, 220 P.3d 595. That is not the situation here, however.

and, in this sense, both are possessed of the same fundamental rights with respect to the parenting of their child. But the same is not true in grandparent-contact cases, where one party is a nonparent asking a court to overturn the decision of a parent notwithstanding the parent's fundamental right to make decisions concerning her child's associates. This second scenario requires delicate balancing of the rights of the parent vis-à-vis the interests of the nonparent, as well as the interests of the child.

¶11 The question remains, then, as to the analysis the District Court was to conduct in considering Tanya's motion. As just explained, § 40-4-219, MCA, is not the appropriate framework; yet, as noted earlier, the grandparent-contact statutes do not expressly address modifications to or terminations of a previously entered contact order (except where the child is adopted by a person other than a stepparent or a grandparent, in which case contact is automatically terminated, *see* § 40-9-102(7), MCA, which is not the situation here). We must turn, therefore, to the underlying constitutional principles and legislative intent regarding initial petitions for grandparent contact and apply those to motions for modification or termination of an existing contact order.

¶12 The Supreme Court has held that, in addition to the specific freedoms protected by the Bill of Rights, the "liberty" specially protected by the Fourteenth Amendment's Due Process Clause includes the right to direct the education and upbringing of one's children. *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S. Ct. 2258, 2267 (1997). Indeed, "the interest of parents in the care, custody, and control of their children" is perhaps the oldest of the fundamental liberty interests the Supreme Court has recognized under the Due Process Clause. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000)

8

(plurality opinion). "The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children," including "the inculcation of moral standards, religious beliefs, and elements of good citizenship." *Wisconsin v. Yoder*, 406 U.S. 205, 232, 233, 92 S. Ct. 1526, 1541, 1542 (1972). "This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Id.* at 232, 92 S. Ct. at 1541-42.

¶13 We have likewise recognized that " 'a natural parent's right to care and custody of a child is a fundamental liberty interest.' " *In re E.W.*, 1998 MT 135, ¶ 12, 289 Mont. 190, 959 P.2d 951 (quoting *In re R.B., Jr.*, 217 Mont. 99, 103, 703 P.2d 846, 848 (1985)). This Court has held that "the constitutional rights of a natural parent to parent his or her child" require " 'careful protection.' " *In re A.R.A.*, 277 Mont. 66, 70, 919 P.2d 388, 391 (1996) (quoting *In re Doney*, 174 Mont. 282, 286, 570 P.2d 575, 577 (1977)).

¶14 In *Troxel*, the Supreme Court considered a Washington statute (Wash. Rev. Code § 26.10.160(3) (1994)) which permitted "[a]ny person" to petition a superior court for visitation rights "at any time," and which authorized that court to grant such visitation rights whenever "visitation may serve the best interest of the child." The Washington Supreme Court held this statute invalid on its face, *In re Smith*, 969 P.2d 21 (Wash. 1998), and the Supreme Court affirmed, although under somewhat differing rationales.

¶15 A plurality (Justice O'Connor, joined by Chief Justice Rehnquist, Justice Ginsburg, and Justice Breyer) concluded that the statute, as applied to Granville (the mother), unconstitutionally infringed her fundamental parental right to make decisions concerning the care, custody, and control of her two daughters. *Troxel*, 530 U.S. at 67,

120 S. Ct. at 2060-61. Essentially, the plurality found the trial court's decision problematic, not because the court had intervened in the dispute between Granville and the Troxels (the grandparents), but because its decision granting the Troxels' petition for visitation rights was based on "nothing more than a simple disagreement" with Granville, a fit custodial parent. *Id.* at 69, 72, 120 S. Ct. at 2062, 2063. The trial court gave no special weight at all to Granville's determination of her daughters' best interests; the court's presumption in favor of grandparent visitation directly contravened the traditional presumption that a fit parent will act in the best interest of her child; and in that respect, the court failed to provide any protection for Granville's fundamental constitutional right to make decisions concerning the rearing of her own daughters. *Id.* at 69-70, 72, 120 S. Ct. at 2062, 2063; *see also id.* at 67-68, 120 S. Ct. at 2061.

¶16 Writing separately, Justice Souter would have affirmed the Washington Supreme Court's determination that its statute was invalid on its face because it swept too broadly. *See id.* at 75-77, 120 S. Ct. at 2065-66 (Souter, J., concurring in the judgment). Also writing separately, Justice Thomas concluded that "the State of Washington lacks even a legitimate governmental interest—to say nothing of a compelling one—in second-guessing a fit parent's decision regarding visitation with third parties." *Id.* at 80, 120 S. Ct. at 2068 (Thomas, J., concurring in the judgment).

¶17 Six years later, in *Polasek v. Omura*, 2006 MT 103, 332 Mont. 157, 136 P.3d 519, this Court considered the interplay between *Troxel* and § 40-9-102, MCA. At the time, the statute authorized a district court to grant grandparent-grandchild contact "upon a finding by the court, after a hearing, that the contact would be in the best interest of the

child." *See Polasek*, ¶ 10 n. 2. We concluded that while this criterion was not inconsistent with *Troxel*, the statutory scheme failed to delineate all of the criteria that must be considered in a grandparent-contact proceeding. After examining the *Troxel* decision, we concluded that the following procedure must be followed. First, the court must determine whether the child's parent is fit, i.e., whether the parent " 'adequately cares for his or her children.' " *Polasek*, ¶ 15 (quoting *Troxel*, 530 U.S. at 68, 120 S. Ct. at 2061). Second, if the parent is fit, then a presumption arises in favor of the parent's wishes, because " 'the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a "better" decision could be made.' " *Polasek*, ¶ 15 (quoting *Troxel*, 530 U.S. at 72-73, 120 S. Ct. at 2064). But if the parent is not fit, then no presumption arises and the parent's wishes are due no deference. *Polasek*, ¶ 15. Lastly, we noted that the statute's best-interest standard "remains intact as the standard by which a grandparent's request for contact must be judged." *Polasek*, ¶ 20. But we held that the petitioning grandparent must prove "by clear and convincing evidence" that it is in the child's best interest to have contact with the grandparent and, in the case of an objecting fit parent, that the presumption in favor of the parent's wishes has been rebutted. *Polasek*, ¶ 15. We explained that the clear-and-convincing standard is proper given the "close scrutiny" we apply to any infringement on a person's right to parent a child. *Polasek*, ¶ 15 (citing *In re Aschenbrenner*, 182 Mont. 540, 544-45, 597 P.2d 1156, 1160 (1979), and *Pierce v. Pierce*, 198 Mont. 255, 260, 645 P.2d 1353, 1356 (1982)). We then reversed and remanded the case for further proceedings given that the district court had not inquired

11

into the mother's fitness as a parent and had failed to accord her wishes any deference. *See Polasek*, ¶¶ 16-17. Indeed, not unlike the present case, the district court had reasoned that "[o]ther than Petra [the mother] and Dr. Allen's [the child's clinical psychologist] concern that the grandparents may impart something negative about the mother, there is not a scintilla of evidence in this case that unfettered visitation between grandparents and child would be in anyway [sic] harmful to the child." *See Polasek*, ¶ 16.

¶18 Following our decision in *Polasek*, the Legislature amended § 40-9-102(2), MCA, "to make Montana statutes reflect [the holdings in *Troxel* and *Polasek*] regarding the constitutional rights of custodial parents to determine who a child may or may not have contact with." Laws of Montana, 2007, ch. 495, at 2228. As further explained in the preamble to SB 27 (2007), "the Legislature believes in the constitutional right of parents to control the actions and conduct of their children and believes that third parties should not be allowed, through the courts, to control the actions of those children if the parents are fit and proper parents." *Id*. To that end, the Legislature incorporated into the statute the procedure set out in ¶ 15 of *Polasek*. *See id.*, § 1, at 2229. Following another amendment in 2009, which clarified the standard for determining parental fitness, *see* Laws of Montana, 2009, ch. 92, § 1, at 1377-78, the statute now states, in pertinent part:

> (1) Except as provided in subsection (7), the district court may grant to a grandparent of a child reasonable rights to contact with the child . . . .
> (2) Before a court may grant a petition brought pursuant to this section for grandparent-grandchild contact over the objection of a parent whose parental rights have not been terminated, the court shall make a determination as to whether the objecting parent is a fit parent. A determination of fitness and granting of the petition may be made only after a hearing, upon notice as determined by the court. Fitness must be

12

determined on the basis of whether the parent adequately cares for the parent's child.

(3) Grandparent-grandchild contact may be granted over the objection of a parent determined by the court pursuant to subsection (2) to be unfit only if the court also determines by clear and convincing evidence that the contact is in the best interest of the child.

(4) Grandparent-grandchild contact granted under this section over the objections of a fit parent may be granted only upon a finding by the court, based upon clear and convincing evidence, that the contact with the grandparent would be in the best interest of the child and that the presumption in favor of the parent's wishes has been rebutted.

.  .  .

(7) This section does not apply if the child has been adopted by a person other than a stepparent or a grandparent. Grandparent-grandchild contact granted under this section terminates upon the adoption of the child by a person other than a stepparent or a grandparent.

Section 40-9-102, MCA.

¶19 As stated earlier, we must apply the principles underlying the *Troxel* and *Polasek* decisions and the legislative intent underlying § 40-9-102, MCA, to a motion by the parent to modify or terminate an existing order for contact. In so doing, we first observe that the constitutional rights discussed in *Troxel* and *Polasek* do not simply evaporate because a contact order has been issued. The parent still retains her fundamental right to make decisions concerning the care, custody, and control of her children. And, as a component of that right, the parent may obtain modification or termination of a previously issued contact order where it is in the best interests of the child or where the contact previously ordered by the court is unduly interfering with the parent's primary role in the child's upbringing, including the inculcation of moral standards, religious

13

beliefs, and elements of good citizenship.[4]  Contrary to Tanya's suggested approach, the parent (as the moving party) has the burden to show that modification or termination is appropriate.  *See* §§ 26-1-401, -402, MCA.  However, we conclude that this showing must be made by a preponderance of the evidence, rather than clear and convincing evidence.[5]  Furthermore, in evaluating the evidence, a fit parent's estimation of her child's best interests is entitled to deference, and the judge may not disregard or reject a fit parent's views on continued visitation simply because he disagrees with them or thinks himself more enlightened than the parent.  Finally, the parent is not required to establish that the previously ordered contact has, is, or will cause the child concrete harm.  We reject the proposition that a child must suffer demonstrable harm as a result of the contact before the contact order may be modified or terminated (the "cause and effect" standard employed by the District Court in this case).  Nor is the parent restricted in the presentation of evidence to "facts that have arisen since the prior plan or that were unknown to the court at the time of entry of the prior plan."  Section 40-4-219(1), MCA

---

[4] The Legislature, of course, may enact reasonable procedures designed to prevent frivolous or vexatious motions to modify or terminate a contact order.  *Cf.* § 40-4-219(5), MCA ("Attorney fees and costs must be assessed against a party seeking frivolous or repeated amendment if the court finds that the amendment action is vexatious and constitutes harassment.").  As for the present case, however, there is no indication that Tanya's motion (which she filed after roughly 15 months of court-ordered contact) was frivolous or vexatious.

[5] In *Polasek*, we held that *the petitioning grandparent's* showings must meet the clear-and-convincing standard.  *Polasek*, ¶ 15.  We adopted this high standard because of the close scrutiny we apply to any infringement on a person's right to parent a child.  *Id.* But where *the parent* seeks to modify or terminate an existing order for contact, it is counterintuitive to require her to meet this same high standard, which as noted was adopted in the first place to protect her rights against infringement by the grandparent.  We therefore adopt the lesser preponderance standard for a parent seeking modification or termination.

14

(concerning parenting plan amendments). There are myriad facts—some occurring before the entry of a grandparent-contact order, and some occurring after it—that may inform a parent's views on the prudence of continued contact with the nonparent. To adequately protect the parent's fundamental constitutional right to make decisions concerning the care, custody, and control of her child, the parent must be allowed to present any evidence which bears on those decisions as they relate to contact with the nonparent.

¶20     In the present case, the May 2008 stipulation essentially short-circuited the process dictated by § 40-9-102, MCA. No determination has been made as to whether Tanya is a fit parent—i.e., whether she adequately cares for her children. *Troxel*, 530 U.S. at 68, 120 S. Ct. at 2061; *Polasek*, ¶ 15; § 40-9-102(2), MCA. And no determination has been made (if Tanya is in fact a fit parent) as to whether the presumption in favor of her wishes has been rebutted by clear and convincing evidence. *See* § 40-9-102(4), MCA. Also, while the stipulation states that "it serves the best interests of the children for there to be grandparent/grandchild contact," the District Court never made such a finding based specifically on clear and convincing evidence. *See* § 40-9-102(3), (4), MCA. At this late point, however, these omissions are essentially water over the dam.

¶21     On remand, it will be necessary for the District Court to make a fitness determination under § 40-9-102(2), MCA, and to allow Tanya to present evidence that modification or termination of the court's May 27, 2008 contact order is in the best interests of her children or is necessary because the grandparent-grandchild contact previously ordered by the court is unduly interfering with Tanya's primary role in the

15

children's upbringing. As noted, Tanya must show by a preponderance of the evidence that modification or termination is appropriate. And if the court finds that she is a fit parent, then Tanya's views on continued visitation and the best interests of her children must be given deference in the court's analysis.

## CONCLUSION

¶22 The District Court applied an incorrect standard for evaluating Tanya's request to modify or terminate the court's May 27, 2008 order for grandparent-grandchild contact. Accordingly, we reverse the District Court's December 30, 2009 Order and remand this case for further proceedings consistent with this Opinion.[6]

¶23 Reversed.

/S/ JAMES C. NELSON

We Concur:

/S/ MIKE McGRATH
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS
/S/ JIM RICE

---

[6] Given our disposition of this appeal, we need not address Tanya's claims that the grandparent-grandchild contact statutes violate her fundamental right to parent by restricting her ability to modify or terminate court-ordered contact when the grandparent has interceded in the parent-child relationship. As for Tanya's request that we reverse the District Court's order holding her in contempt, our reversal of the court's December 30, 2009 order disposes of that particular contempt ruling. As for the subsequent contempt ruling of February 25, 2010, that ruling is beyond the scope of this appeal.