FILED

December 29 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0292

DA 15-0292

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 350

IN RE THE MARRIAGE OF:

HERBERT CHRISTIAN PASCHEN,

      Petitioner and Appellant,

  v.

ANNE KEMSLEY PASCHEN,

      Respondent and Appellee.

| | |
|---|---|
| APPEAL FROM: | District Court of the Eleventh Judicial District,<br>In and For the County of Flathead, Cause No. DR 12-825(A)<br>Honorable Ted O. Lympus, Presiding Judge |

COUNSEL OF RECORD:

      For Appellant:

          Matthew D. Neill, Johnson-Gilchrist Law Firm, Whitefish, Montana

      For Appellee:

          Brian Muldoon, Law Office of Brian Muldoon, P.C., Whitefish, Montana

      For Amicus Curiae:

          P. Mars Scott, P. Mars Scott Law Offices, Missoula, Montana

                Submitted on Briefs:  November 18, 2015
                            Decided:  December 29, 2015

Filed:

_____
                        Clerk

Justice Patricia Cotter delivered the Opinion of the Court.

¶1     In March 2015, the Eleventh Judicial District Court, Flathead County, issued its Findings of Fact, Conclusions of Law, Orders on Contempt and Decree of Dissolution, dissolving the marriage of the parties, dividing property, and imposing orders of maintenance and child support.  Herbert Paschen (hereinafter Herb) appeals the order claiming the District Court's distribution of the marital estate and its award of maintenance and child support were inequitable and were not supported by substantial evidence.  We affirm in part and reverse and remand in part.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2     Herb Paschen and Anne Kemsley (hereinafter Anne) were married in November 1996.  They had three children between 1997 and 2003 and Anne remained at home with the children rather than working outside of the home.  Beginning in 1998, Herb worked in sales and finance with various financial employers in California where the couple resided.  In 2005, he became an officer and mortgage consultant with a national bank in Jackson Hole, Wyoming, earning approximately $100,000 annually.  In 2007, however, he lost his banking job and established Fox Creek Holding, L.L.C., a land development corporation, with one of his banking clients.  Herb and his partner each initially invested between $150,000 and $200,000 into the company, and obtained a loan for $3.2 million, personally guaranteed by Herb and his partner.  In July 2008, Herb's partner died in a helicopter crash.  Herb attempted to keep the corporation viable but the company subsequently failed in 2010.  The lending bank foreclosed on the unpaid note and

2

obtained a judgment of $5.4 million against Herb and his business partner's estate. Herb stipulated to a judgment against him in the amount of $5.4 million.

¶3 Between 2007 and 2010, while establishing and operating Fox Creek, Herb claimed he generated no income to support his family. Herb's mother, Leslie Douglass (hereinafter Bunny), gifted the family $75,000 for each of those years. Herb accrued approximately $250,000 in legal fees during these years, some of which were incurred in the corporate lawsuit, and Bunny paid these fees in their entirety.

¶4 Anne did not actively participate in the family's finances and testified that she believed the money from Bunny was the only money the family had at its disposal between 2007 and 2010. Undisputed evidence presented at trial, however, revealed that in 2007 Herb wrote checks for over $400,000, including a check to himself for $191,000, the purpose of which he could not recall at trial. Similarly, Herb spent considerable amounts beyond the gifted $75,000 during 2008 and 2009. The District Court calculated that between 2007 and 2010, Herb spent approximately $1,724,000.00, or an average of $431,000/year. Herb could not account at trial for the source of most of this money.

¶5 In July 2011, Anne initiated two legal proceedings against Herb in Wyoming— one for marital dissolution and the other for a restraining order following a physical altercation. During this time, Anne and two of the children remained in the Wyoming home and Herb and the couple's oldest son moved to California. Herb testified to the Wyoming court that he was able to earn $100,000/year. The court adopted this figure, and in September 2011, ordered Herb to pay $2,713.81/month in child support and temporary support to Anne. Herb did not challenge this ruling. However, in August

3

2012, the Wyoming court dismissed the dissolution proceedings by stipulation of the parties. Herb had not paid any of the court-ordered support as of the time of dismissal.

¶6 Subsequently, Anne and two of the children moved to Montana and Herb and the eldest son joined them in an attempted reconciliation. The reconciliation failed within weeks and Herb moved to Oregon in the fall of 2012. The three children remained with Anne. After Herb and Anne separated, Bunny stopped gifting the family $75,000 but began giving Herb approximately $30,000/year for his living expenses.

¶7 Herb filed for divorce in the Eleventh Judicial District Court, Flathead County, Montana, on December 27, 2012. In September 2013, Bunny paid Herb's delinquent support obligation arising from the Wyoming order of support. In October 2013, the District Court conducted a two-day bench trial at which both Herb and Anne testified, as did the Director of Family Court Services for the District Court, a psychologist who performed a parenting evaluation in the matter, and a former friend and neighbor of the couple.

¶8 On March 31, 2015, the District Court issued its order dissolving the marriage. The order describes both marital assets valued at $95,966, and distributed marital assets valued at $104,466.[1] The $95,966 value of the marital assets consisted of a checking account, 2 horses, a horse trailer, 2 vehicles, a piano and miscellaneous furniture, silver, china, and kitchenware. The most valuable item included in marital assets was $50,000 for missing jewelry belonging to Anne. The court found that at the time of separation

---

[1] The list of distributed marital assets set forth in the order totals $86,466. On remand, the District Court should re-calculate the value of distributed marital assets.

4

Herb removed the jewelry from a safe to which he alone had access; therefore, the court ordered Herb to return the jewelry or to pay Anne the $50,000 attributed value. The court also declared that the jewelry was Anne's "sole and separate property," which would not be considered a marital asset subject to distribution. The court did not include the value of this jewelry in the distribution of marital assets.

¶9 The court distributed all the marital assets with the exception of the $50,000 in jewelry. The court also attributed $25,000—not included in marital assets—to Herb representing the value of guns Herb had taken upon separation. It attributed $15,500— also not included in marital assets—to Anne representing the value of a tractor and other items sold by Anne post-separation. The District Court noted that none of the property distributed to the parties constituted income-producing or income-generating property.

¶10 The court also allocated marital debt between the parties. Anne was assigned $16,058 of family debt. Herb was assigned $5,580,625 of debt, which included $5,420,608 for the judgment associated with the Fox Creek Holding corporate failure and $160,017 for other marital debts.[2] The court expressly acknowledged the "grossly disproportionate allocation" but justified it based upon Herb's claim that he intended to seek bankruptcy which would allow him to avoid most or all of the debt.

¶11 Lastly, the District Court addressed the proposed parenting plan, child support and maintenance. The court imputed an annual earning capacity to Herb of $175,000— $100,000 based upon Herb's self-represented earning ability and $75,000 based upon

---

[2] Herb testified at the dissolution hearing that he believed the entire Fox Creek Holding debt should be allocated to him.

past gifts from his mother. Using this imputed earning capacity, the court ordered Herb to pay $3,247.00/month in child support and $3,753.00/month as maintenance to Anne—both to be paid until January 2022. Other facts and arguments are further addressed below.

¶12 Herb appeals. Bunny, through counsel, has filed an amicus brief with respect to the propriety of including gifted property as income for purposes of calculating child support and maintenance.

## ISSUES

¶13 A restatement of the issues on appeal is:

¶14 Did the District Court err in the amount of income it imputed to Herb for the purpose of setting monthly child support and maintenance payments?

¶15 Did the District Court err and/or abuse its discretion in apportioning the marital estate?

## STANDARD OF REVIEW

¶16 The distribution of marital property in a dissolution proceeding is governed by § 40-4-202, MCA, under which a trial court is vested with broad discretion to distribute the marital property in a manner that is equitable to both parties. When dividing marital property, the trial court must reach an equitable distribution, not necessarily an equal distribution. The district court's apportionment of the marital estate will stand unless there has been a clear abuse of discretion as manifested by a substantially inequitable division of the marital assets resulting in substantial injustice. *Richards v. Trusler*, 2015 MT 314, ¶ 11, 381 Mont. 357, 360 P.3d 1126 (internal citations omitted).

6

¶17	We review a district court's findings of fact regarding division of marital property, child support, and maintenance awards to ascertain whether they are clearly erroneous. We apply a three-part test to determine if a finding is clearly erroneous. First, the Court will review the record to see if the findings are supported by substantial evidence. Second, if the findings are supported by substantial evidence we will determine if the trial court has misapprehended the effect of evidence. Third, if substantial evidence exists and the effect of the evidence has not been misapprehended the Court may still find that "A finding is 'clearly erroneous' when, although there is evidence to support it, a review of the record leaves the [C]ourt with the definite and firm conviction that a mistake has been committed." *Richards*, ¶ 12. (Internal citations omitted.)

### DISCUSSION

¶18	*Did the District Court err in the amount of income it imputed to Herb for the purpose of setting monthly child support and maintenance payments?*

¶19	The District Court imputed an annual earning capacity to Herb of $100,000 based in part upon Herb's 2011 testimony in the Wyoming court and that court's imputation of potential income to him of $100,000. Additionally, noting that Herb's mother had gifted the family $75,000/year in the past, the District Court included $75,000 in addition to the imputed $100,000 in its calculation of annual resources available to Herb. Based upon this annual figure of $175,000, the District Court ordered Herb to pay monthly child support of $3,247.00 and maintenance of $3,753.00.

¶20	Herb argues that the District Court erred in both the $100,000 imputation of earning capacity and the inclusion of his mother's past charitable gifts to the family as

7

"resources available" to pay child support and maintenance. Anne counters that sufficient evidence was presented to support the District Court's ruling and it should not be disturbed. We address each of these imputed income resources below.

*Imputation of $100,000 annual earning capacity*

¶21 Under the Montana dissolution of marriage statutes, a district court can order a party to a dissolution proceeding to pay maintenance to the other party and to pay child support. Section 40-4-203(2), MCA, requires the court to consider the financial resources of the party seeking maintenance as well as the "ability of the spouse from whom maintenance is sought" to meet his or her own needs and the maintenance request of the other party. With respect to child support, § 40-4-204, MCA, obligates the court to consider, among other things, the financial resources of the child and the parents, as well as the child's standard of living had the parents not gotten divorced.

¶22 The Administrative Rules of Montana instruct what "income" can be considered for purposes of determining child support. Admin. R. M. 37.62.105(1) states: "Income for child support includes actual income, imputed income as set forth in ARM 37.62.106, or any combination thereof which fairly reflects a parent's resources available for child support." "Imputed income" means "income not actually earned by a parent, but which is attributed to the parent" based on: (a) the parent's recent work history; (b) occupational and professional qualifications; and (c) existing job opportunities and associated earning levels in the community. Admin. R. M. 37.62.106(1) and (3)(a)-(c). Additionally, income should be imputed whenever a parent is unemployed or underemployed, fails to

8

produce sufficient proof of income or has an unknown employment status. Admin. R. M. 37.62.106(2)(a)-(d).

¶23 Herb asserts that his "recent work history" clearly establishes that he has not been able to earn $100,000/year since before 2007 and that his income prospects from his current employment are $50,000 to $60,000, which is substantially lower than $100,000. He claims this alone is sufficient to establish that the District Court abused its discretion in imputing a $100,000 earning capacity to him.

¶24 Anne counters that Herb's extensive professional work history establishes his ability to command a significant salary but that Herb chooses to be voluntarily and vindictively underemployed. She points to Herb's resume claims that he created a $65 million portfolio in commercial loans "from his basement" for the national bank which once employed him and his experience of rising from a mortgage broker to a bank vice president as examples of his ability to obtain high-paying professional employment. Anne further maintains that Herb enjoys generous access to his mother's significant wealth or has considerable hidden personal wealth as evidenced by produced financial records. Consequently, she urged the District Court to impute to Herb an income of $410,000/annually.

¶25 The District Court was presented with concrete evidence of Herb's ability to earn approximately $100,000 annually. Herb's trial exhibits reflect adjusted gross income earnings between 2001 and 2006 ranging from $46,830 to $93,366. In 2009, Herb sued the widow of his deceased Fox Creek business partner in Idaho, and claimed in the complaint that his "time [with Fox Creek] was worth $100,000" annually. Additionally,

in the Wyoming court's September 2011 Order Requiring Child Support and Temporary Support, the court stated "[Herb] anticipates earning an annual gross income of $100,000." Based upon this evidence, the Wyoming court ordered Herb to pay $2,713.81/month in child support and Herb did not challenge this ruling.

¶26 We conclude the District Court did not err in imputing $100,000 income to Herb, in part premised upon his own assertions of his likely earning power. *Anderson v. Anderson*, 2014 MT 111, ¶ 15, 374 Mont. 526, 323 P.3d 895. Between 1998 and 2007, he was (1) a residential loan officer for a mortgage company, (2) an account executive for a finance group, and (3) a commercial lender for a national bank. His self-proclaimed successes at those jobs demonstrate a high earning capability. We acknowledge that his annual income dropped significantly following the unfortunate experience with Fox Creek Holding, during which he deferred income for several years. Additionally, we note that subsequent to the demise of Fox Creek, Herb held low-paying temporary jobs. We need not determine whether he chose to be underemployed as argued by Anne or was unable to find a position commensurate with his previous employment. Herb now enjoys a professional sales position in which he expects to earn between $50,000-$60,000 in commissions during his first year. He testified that he expects even greater commission income in his second and subsequent years. Thus, based upon Herb's work history, professional qualifications, and existing job opportunities, it was not clearly erroneous for the court to conclude that Herb will reach his imputed income. Admin. R. M. 37.62.106(1) and (3)(a)-(c). We therefore affirm the District Court's imputation of $100,000 annual income to Herb.

*Imputation of $75,000*

¶27     Whether gifts of cash should constitute income for purposes of calculating child support is a question of first impression for the Court. We therefore look to the language of our statutes and regulations and to other states for guidance. Herb and his mother in her amicus brief argue that the District Court erred in imputing $75,000/year to his income based upon Bunny's past charitable gifts to the family. Anne asserts that Herb produced no evidence that the considerable financial resources he utilized over the past several years were actually gifts from his mother, but if they were she argues that the administrative rules require the court to consider "economic benefit from whatever sources derived," including gifts.

¶28     In her amicus brief, Bunny traces the previous administrative rule, Admin. R. M. 46.30.1513, back to 1990 when the Department of Social and Rehabilitation Services (DSRS) governed the Montana child support guidelines. At that time, the rule required courts to consider a parent's net resources available for child support, including both "gross income" and "imputed income." "Gross income" expressly *included* "gifts and prizes." Admin. R. M. 46.30.1513(1)(a) and (b)(1990). In 1992, after proposed amendments were adopted, Admin. R. M. 46.30.1513 continued to address "imputed income," while newly-adopted Admin. R. M. 46.30.1508 (1992) addressed the determination of "gross income." "Gifts and prizes" were no longer included as examples of "gross" or "imputed" income in the new rules.

¶29     In 1995, the Department of Public Health and Human Services (DPHHS) assumed authority over the child support guidelines and the applicable rules were moved from

11

Title 46 to Title 37. In 1998, DPHHS adopted substantial revisions to the child support guidelines. The agency replaced reference to "gross income" with the term "actual income," which included, among other things, "economic benefit from whatever source derived." Admin. R. M. 37.62.106 (1998). Multiple forms of income such as wages, tips, commissions, bonuses, etc., were provided as examples but again the rule addressing "actual income" did not include gifts, prizes, or inheritances. In the comments issued during the rule changing process, the agency stated it was revising Admin. R. M. 37.62.106 "to provide a single reference point to determine if a source of funds or ability to obtain funds should be counted as income, real or imputed, in order to appropriately determine each parent's child support obligation." 1998 Mont. Admin. Register 334.

¶30 The regulations remained unchanged until 2012. At that time, DPHHS adopted Admin. R. M. 37.62.105 to address the determination of "actual income" for child support purposes. Admin. R. M. 37.62.106 remained dedicated to the determination of imputed income for child support purposes. Again, the agency chose to exclude gifts, prizes, and inheritances as a source of income for purposes of calculating child support.

¶31 In addition to their reliance on the administrative rules, Herb and Bunny further argue that in determining child support obligations, the applicable statutes require courts to look to the resources of the *parents* and not to the resources of other relatives or persons who are part of the parent's household.

¶32 It is clear from the former and current statutes and regulations addressing the determination of income for purposes of calculating child support that the regulatory agency chose to remove express reference to "gifts" from the inclusion in actual or

imputed income. Furthermore, while the Legislature has amended the governing statute, § 40-4-204, MCA, more than a dozen times since its enactment in 1975, it has chosen not to expressly define what constitutes a parent's "financial resources." Rather, it directs a court issuing a child support order to "determine the child support obligation by applying the standards in this section and the uniform child support guidelines" adopted by DPHHS. Section 40-4-204, MCA, instructs the courts that the "guidelines must be used in all cases." Given the number of revisions to both the applicable statute and regulations, DPHHS and the Legislature had every opportunity to expressly include "gifts" as income had that been the intention. Neither did so.

¶33 Section 1-2-101, MCA, states that "In the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." We therefore decline to re-insert "gifts" into the legislative or regulatory provisions setting forth the sources to be considered in calculating child support.

¶34 We also find case law from other jurisdictions persuasive on this point. Statutes and regulations in some states do include gifts as resources available for child support computations. *See* O.C.G.A. § 19-6-15(f)(1)(A) (xviii) and Tenn. Comp. R. & Regs. R. 1240-2-4-.04(3)(a)1(xviii). *See also* Ind. Child Support R. & Guidelines 3(A)(1) (Weekly gross income includes gifts.) and Va. Code Ann. § 20-108.2.C (Gross income includes gifts.). In other states with statutes that do not expressly require gifts to be considered as income for child support purposes, courts have exercised their discretion and interpreted their statutes broadly to allow consideration of gifts. In *In re Marriage of*

*Alter*, 171 Cal. App. 4th 718 (2009), the California Appeals Court acknowledged that Cal. Fam. Code § 4058 defining gross income of each parent did not "mention gifts at all," but required courts to consider "income from whatever source derived." There, the court concluded that monthly cash gifts of $6,000 from the father's mother over more than a decade constituted "gifts that bear a reasonable relationship to the traditional concept of income as a recurrent, monetary benefit." *Alter*, 171 Cal. App. 4th at 736-37. *See also Petersen v. Petersen*, 22 S.W.3d 760 (Mo. Ct. App. 2000), in which the court imputed gift income to Mother based upon her parent's annual gift of $20,000 during the marriage.

¶35  Conversely, other courts have declined to consider gifts as income. In *Nass v. Seaton*, 904 P.2d 412 (Alaska 1995), father appealed the Superior Court's inclusion in his income of monetary gifts from his parents. Nass received $20,000 annually from his parents from 1990 through 1992, with the expectation he would receive another $20,000 in 1993. The Superior Court calculated Nass's child support obligation based, in part, upon these gifts. *Nass*, 904 P.2d at 414. The Alaska Supreme Court reversed the ruling stating:

> Review of authorities addressing the question of whether gifts to the obligor parent should be considered income for purposes of determining the level of the obligor's support obligation leads us to the determination that the principal amount of gifts and inheritances should not be considered as income for purposes of [Alaska R. Civ. P. 90.3 (defining "adjusted gross income" for child support purposes)]. We are persuaded that any other approach blurs the easily administered and well-established historical distinction between gifts and earned income. In short, we conclude that the authorities which refuse to recognize the inclusion of gifts in determining the level of the obligor's adjusted gross income for purposes of calculating a child support obligation represent the correct rule of law. We therefore

> hold that it was error for the superior court to include any gifts from Fred's parents in calculating his child support obligation under Civil Rule 90.3.

*Nass*, 904 P.2d at 416.

¶36   In *True v. True*, 615 A.2d 252 (Maine 1992), the Maine Supreme Court rejected father's argument that mother's gross income should include her grandmother's regular monetary gifts. He argued that while the applicable statute, 19 M.R.S.A. § 311(5)(A) (1991), did not reference "gifts," it defined "gross income" as "any ongoing source," and that mother's gifts from her grandmother therefore qualified. The Court disagreed, reasoning that mother's grandmother was under no legal obligation to pay the money. Consequently, the court concluded the monetary gifts were not income. *True*, 615 A.2d at 253.

¶37   We are persuaded by the rationales of *Nass* and *True*. Bunny has no legal obligation to continue these gifts; in fact, she ceased gifting the family $75,000 per year in 2011. It would be fundamentally unfair to base a parent's future monthly child support obligation on gifts not yet received and which may never be given. The unpredictable largesse or generosity of a third person should not be a basis for determining a parent's ability to provide child support. We therefore reverse the District Court's order imputing to Herb $75,000 in annual earnings for purposes of child support calculation.

¶38   We also conclude that it was inappropriate for the District Court to take into account Bunny's past monetary gifts when calculating Herb's maintenance obligation. Unlike the statutes and supporting regulations governing child support, the maintenance statute does not contemplate the imputation of income to a spouse tasked with paying

15

maintenance. Rather, the District Court is tasked with considering the paying spouse's ability to meet his own needs while meeting the needs of the spouse seeking maintenance. Section 40-4-203(2)(f), MCA. Because there is no guarantee that Herb will continue to receive substantial gifts from Bunny into the foreseeable future, it would be inappropriate to factor such unknowable additional resources into Herb's income for purposes of calculating maintenance. We therefore conclude that to the extent the court's findings of fact concerning maintenance took into account future income deriving from Bunny's gifts, these findings were clearly erroneous.

¶39 As we have determined Herb's mother's gifts to Herb are not to be considered as income, we need not address Herb's complaint that the District Court erred in failing to consider Anne's parents' gifts to her as income. We further decline to address Anne's claim that Herb and Bunny are intentionally hiding resources from Anne, the district court, and the Internal Revenue Service. While Anne alluded in the District Court to Herb and Bunny engaging in a "game of hiding money," she presented no evidence or legal argument in support of such a claim to the District Court. It is well-established that we will not address a new legal theory or argument presented for the first time on appeal. *Guill v. Guill*, 2014 MT 316, ¶ 17, 377 Mont. 216, 339 P.3d 81.

¶40    *Did the District Court err and/or abuse its discretion in apportioning the marital estate?*

¶41    Herb asserts that the District Court "vastly underestimated" the seriousness of the $5,580,625 debt to the F.D.I.C. and this underestimation contributed to the District Court's "flawed analysis of the 'resources available'" for determining child support and maintenance. He also claims the District Court abused its discretion in valuing the missing jewelry at $50,000 and requiring Herb to either return the jewelry or pay Anne its value. As we are remanding this matter for a redetermination of income and resources available for purposes of calculating maintenance and child support, and because property distribution may serve in some instances as an alternative to maintenance (*See* § 40-4-202(1)(c), MCA), it may be necessary for the District Court upon remand to review the distribution of the marital assets and debt as well. We leave this determination to the District Court.

¶42    Lastly, we reject Herb's argument that the District Court abused its discretion by issuing a "punitive decree." The District Court was presented with conflicting evidence during the proceeding, and the court's decree repeatedly referenced Herb's lack of credibility. As we have frequently stated, "It is not this Court's function, on appeal, to reweigh conflicting evidence or substitute our evaluation of the evidence for that of the district court. We defer to the district court in cases involving conflicting testimony because we recognize that the court had the benefit of observing the demeanor of witnesses and rendering a determination of the credibility of those witnesses." *State v. Bieber*, 2007 MT 262, ¶ 23, 339 Mont. 309, 170 P.3d 444 (citation omitted). We

conclude that though remand is necessary for the reasons stated, the decree issued by the District Court was not punitive.

## CONCLUSION

¶43     For the foregoing reasons, we affirm the District Court's imputation of Herb's earning capacity at $100,000 but reverse and remand the court's inclusion of Bunny's monetary gifts into his annual resources for purposes of child support and spousal maintenance calculation.

¶44     Reversed and remanded for further proceedings consistent with this Opinion.


                                                    /S/ PATRICIA COTTER

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ MICHAEL E WHEAT
/S/ JIM RICE