FILED

09/08/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0080

DA 20-0080

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2020 MT 224

IN RE THE PARENTING OF K.J.K., n/k/a K.J.C.:

DOREEN and JAMES KING,

　　　Petitioners and Appellants,

　　v.

KENLEY (KING) CHILCOTT and BRIAN CHILCOTT,

　　　Respondents and Appellees.

APPEAL FROM:　　District Court of the Ninth Judicial District,
　　　　　　　　In and For the County of Pondera, Cause No. DR-13-01
　　　　　　　　Honorable Brenda R. Gilbert, Presiding Judge

COUNSEL OF RECORD:

　　　For Appellants:

　　　　　Marcia Birkenbuel, Attorney at Law, Great Falls, Montana

　　　For Appellees:

　　　　　Lucy Hansen, Judnich Law Office, Missoula, Montana

　　　　　　　　　　　　Submitted on Briefs:　June 17, 2020

　　　　　　　　　　　　　　　Decided:　September 8, 2020

Filed:

_____
　　　　　　　Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Appellants, Doreen and James King (Grandparents), appeal a January 6, 2020, order from the Ninth Judicial District Court, Pondera County, terminating a 2013 Stipulated Parental Agreement (Agreement) which had afforded Grandparents contact and visitation rights with respect to their grandchild, K.J.C.[1] In its order, the District Court granted a motion to terminate the Agreement which was filed by Appellees, Kenley Chilcott (Mother) and Brian Chilcott (Father), who are the biological mother and adoptive stepfather of K.J.C., respectively. We affirm the District Court's decision to terminate the Agreement.

¶2 We restate the dispositive issues on appeal:

1. *Did the District Court correctly determine that the parties' Agreement was a grandparent visitation agreement established under § 40-9-102, MCA, rather than a parental interest agreement under § 40-4-228, MCA?*

2. *Did the District Court correctly apply the legal standard for termination of a § 40-9-102, MCA, grandparent visitation agreement?*

### FACTUAL AND PROCEDURAL BACKGROUND

¶3 Grandparents are the maternal grandparents of K.J.C. Mother and Father are the daughter and son-in-law, respectively, of Grandparents. Mother gave birth to K.J.C. in December 2011, when she was twenty-one years old. Mother and K.J.C. resided with Grandparents in Conrad, Montana, until October 2012, when Mother left her parents' home and moved to Williston, North Dakota with K.J.C.

---

[1] Although the record does not reflect a legal name change for the child, for the purpose of this Opinion, we will refer to the child as his parents do, K.J.C.

¶4    On January 22, 2013, Grandparents filed a petition for a parental interest determination, alleging they had established a child-parent relationship with K.J.C. as defined under § 40-4-211(6), MCA, and were thus entitled to the commencement of a parenting proceeding under § 40-4-211(4)(b), MCA.  Mother filed a response which denied Grandparents' assertion of a child-parent relationship and contended that there was no reason to award Grandparents a parental interest as Mother had "cared for her minor child his entire life" and had "never ceded her exclusive parenting authority or allowed [Grandparents] to function in a parental role."

¶5    On July 25, 2013, following mediation, the parties signed the disputed Agreement which expressly provides as its purpose: "The parties realize that extended family contact is important to the child and this agreement is to set out an organized system to facilitate this contact."  The Agreement stipulated that "[t]he minor child shall reside with [Mother]" but awarded Grandparents weekly telephone contact with K.J.C. and provided a visitation schedule.  This visitation schedule granted Grandparents the right to have K.J.C. visit them in Conrad once every sixty days for a period of five days—which included travel—and also gave them the right to electively schedule shorter visits with K.J.C. in Williston "no more than 4 times per year" on the condition that Mother would also be present in Williston at those times.  The Agreement granted Mother authority over all "[m]ajor [d]ecisions" involving K.J.C.   Although the Agreement authorized both parties to make "emergency health care decisions" for K.J.C. while he was in each party's care, the Agreement also stated that the "Mother shall make decisions regarding the day-to-day care and control of the minor child including all medical decisions."  The Agreement provided

3

the parties would review the visitation schedule the summer before K.J.C. entered kindergarten—and undergo mediation if necessary—in order to provide Grandparents with a revised visitation schedule that was better suited to K.J.C.'s future school schedule. The Agreement also required Mother to provide Grandparents with information about K.J.C.'s future report cards, teacher names, and extracurricular activities once he started school.

¶6 On July 30, 2013, the District Court issued an order which approved and adopted the Agreement. The language of this order provided:

> IT IS ORDERED, ADJUDGED AND DECREED that the Stipulated Visitation Agreement set forth above is adopted and approved as an order of this Court.
>
> WARNING: A party's failure to comply with a provision of this stipulated visitation agreement does not affect another party's obligation to comply with the visitation agreement. Violation of the terms of this order with actual knowledge of its terms is punishable by contempt of court and may be a criminal offense under MCA § 45-7-309.

On August 2, 2013, two days after the District Court issued the above order, Grandparents filed a "Notice of Entry of Judgement." The notice provided that "on the 30th day of July, 2013, the Court entered a Final Judgment awarding [Grandparents] a parental interest, a copy of which is herewith served."

¶7 In 2014, Mother and Father were married. Mother and Father own a home together in Williston where they currently reside with K.J.C.; their daughter, age 4; and Father's son from a prior marriage, who is the same age as K.J.C. On December 7, 2015, Father legally adopted K.J.C. in a proceeding in North Dakota's Williams County District Court. This same adoption proceeding also terminated the parental rights of K.J.C.'s biological father, Vincent Taylor. In 2016, Vincent challenged this ruling in the North Dakota

4

Supreme Court. In *In re Adoption of K.J.C.*, 2016 ND 67, 877 N.W.2d 62, the North Dakota Supreme Court upheld the termination of Vincent's parental rights and Father's adoption of K.J.C. The record indicates that Grandparents traveled to North Dakota in order to testify against Father in this 2016 custody dispute, even though Grandparents were not a party to these proceedings. Later in 2016, Grandparents filed a motion for contempt against Mother in District Court for allegedly failing to adhere to the Agreement governing their visitation rights. Father has since testified that Grandparents filed this contempt motion in response to Mother's refusal to allow her parents to visit with K.J.C. while they were present in North Dakota to testify against Father in his legal proceedings to adopt K.J.C.

¶8 On May 17, 2019, Grandparents filed an additional contempt motion requesting that the District Court enforce the parties' Agreement. Grandparents' motion and supporting affidavit alleged that they had not visited K.J.C. since June of 2018 and that Mother had purposefully failed to comply with their "Parenting Plan." Mother requested mediation pursuant to the terms of the Agreement, which required mediation in the event the parties were unable to agree upon a revised visitation schedule once K.J.C. started to attend school. Mediation of this dispute occurred on June 28, 2019, but the parties did not reach an agreement.

¶9 Following the parties' unsuccessful mediation attempt, Mother filed a motion to join her husband as a necessary party pursuant to M. R. Civ. P., Rule 19. Grandparents objected to Father's joinder as a party. The District Court granted Mother's motion and joined

5

Father as a necessary party, citing Father's legal relationship with K.J.C. as the child's adoptive father.

¶10    On July 2, 2019, Grandparents filed a motion to approve a revised "Parental Contact Schedule" which Grandparents had created unilaterally. Grandparents' revised schedule requested that K.J.C. visit them for one month during each summer and provided for a visit during K.J.C.'s winter and spring breaks from school. On September 24, 2019, Mother and Father responded by filing a motion to terminate the 2013 Agreement, to which Grandparents objected.

¶11    The District Court held a hearing on November 6, 2019. Mother and Father testified that the Agreement had taken a large emotional toll on their family and adherence to the Agreement had become overly burdensome for their family. Father testified that he and Mother had, thus far, made twenty trips to Montana under the Agreement—each of which required them to travel to a meeting spot in Montana that was eight hours away from their North Dakota home. Father also testified that he and Mother had to take multiple days off from work during each of K.J.C.'s court-mandated visits, during which they were also required to find childcare for their two other children. Father further testified that he and Mother would still like to offer Grandparents visits with K.J.C. in the future, but that they wished to do so outside the confines of the legal system and in a way that works better for their family.

¶12    Mother and her brother, Calen King (Calen), also each testified that they were concerned about K.J.C.'s safety when he was in Grandparents' care, largely due to Grandmother's excessive drinking and erratic behavior. Calen testified that he believed

6

both of his parents have mental health and chemical dependency issues. Calen also testified regarding multiple instances where he felt Grandmother, while intoxicated, acted in a verbally abusive manner and threatened violence against him; with one of these instances occurring in June 2018 in the presence of K.J.C. Calen's testimony further noted that he suffered from anxiety and depression, which he attributed to his upbringing.

¶13 Mother testified about her mental health issues and stated that she was "trying to recover from her childhood" with Grandparents. Mother's testimony recalled that she was forced to go to Shodair Children's Hospital when she was fifteen years old and left with a diagnosis of depression. Mother further testified that she felt Grandmother's drinking had gotten out of hand. During visits to Grandparents' home, Mother stated that she had observed Grandmother passed out on the couch from intoxication. Mother also testified that she ended some of K.J.C.'s weekly, court-mandated calls with Grandmother because she could tell that Grandmother was intoxicated during those calls.

¶14 Grandparents' testimony did not contest that Mother and Father were fit parents for K.J.C. During Grandmother's testimony, she denied drinking during several of the instances cited by Mother and Calen. Grandmother also testified that she could not drink alcohol because of her prescription medication, indicating she had been taking Lexapro for a year and Klonopin for six months. Grandfather also testified they do not drink when K.J.C. is with them, and stated that he and Grandmother would be willing to have all three of Mother and Father's children come for visits in order to ease the hardship of K.J.C.'s court-ordered visitations on Mother and Father's family. Four of Grandparents' friends also testified on their behalf, each of whom stated that they had not personally observed

7

any alcohol abuse by Grandparents in the presence of K.J.C. Each of these four witnesses also claimed that they had observed K.J.C. with Grandparents during K.J.C.'s court-ordered visits and generally testified that Grandparents had established a caring and positive relationship with K.J.C.

¶15 On January 6, 2020, the District Court issued its Findings of Fact, Conclusions of Law, and Order that is the subject of this appeal. The order was issued by the same judge who originally approved the parties' Agreement. In its findings of fact, the District Court found "the testimony of Calen King and [Mother] more credible than the testimony of [Grandparents] and their friends" due to "the demeanor and detail" with which Calen and Mother testified. Ultimately, the District Court held that the content of the Agreement addressed grandparent visitation rights and Grandparents did not have any parental interest in K.J.C. Specifically, the District Court ruled that the content of the Agreement dictated its classification as a grandparent visitation agreement formed under § 40-9-102, MCA. Consequently, the District Court ruled that the Agreement was subject to the modification and termination process for a § 40-9-102 agreement that was set forth in *Snyder v. Spaulding*, 2010 MT 151, 357 Mont. 34, 235 P.3d 578. Applying *Snyder*, the District Court held that both Mother and Father were fit parents, as this issue was undisputed by Grandparents. Thus, the District Court afforded Mother and Father the presumption that their wishes were in the best interests of K.J.C and, further, that Mother and Father had demonstrated this by a preponderance of the evidence. The District Court also held that Grandparents had failed to rebut the presumption with clear and convincing evidence as required by § 40-9-102(4), MCA, and *Snyder*, ¶ 20. Overall, the District Court

held that "the minor child's best interests are no longer served by the Court dictating a schedule of grandparent contact in the face of a high level of mistrust and animosity" between the parties. The District Court granted Mother and Father's motion to terminate the 2013 Agreement.

¶16    Grandparents appeal.

## STANDARDS OF REVIEW

¶17    We review a district court's findings of fact regarding parenting plans and related agreements in order to determine whether they are clearly erroneous. *In re the Parenting of M.C.*, 2015 MT 57, ¶ 10, 378 Mont. 305, 343 P.3d 569; *In re the Parenting of C.J.*, 2016 MT 93, ¶ 12, 383 Mont. 197, 369 P.3d 1028; *Paschen v. Paschen*, 2015 MT 350, ¶ 17, 382 Mont. 34, 363 P.3d 444. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if our review of the record convinces us that the district court made a mistake. *M.C.*, ¶ 10.

¶18    We review a district court's interpretation and application of statutes for correctness. *Polasek v. Omura*, 2006 MT 103, ¶ 8, 332 Mont. 157, 136 P.3d 519 (setting forth this standard in the context of Montana's Title 40 parenting statutes).

## DISCUSSION

¶19    Grandparents seek reversal of the District Court's order terminating the Agreement and request the District Court enter a revised parental contact schedule—such as the revised schedule submitted by Grandparents—which takes into account K.J.C.'s school and summer schedule. Grandparents advance several arguments in support of their request.

We restate Grandparents' contentions as two dispositive issues: (1) whether the parties' Agreement constituted an agreement formed under § 40-9-102, MCA, or under § 40-4-228, MCA; and, (2) whether the District Court's January 2020 order to terminate the Agreement correctly applied the legal standard for termination of a grandparent visitation agreement as set forth in *Synder*. We now consider each of these issues in turn.[2]

¶20    *1. Did the District Court correctly determine that the parties' Agreement was a grandparent visitation agreement established under § 40-9-102, MCA, rather than a parental interest agreement under § 40-4-228, MCA?*

¶21    Montana's statute governing grandparent-grandchild visitation agreements provides that "[T]he district court may grant to a grandparent of a child reasonable rights to contact

---

[2] In addition to the two primary issues which merit discussion by this Court, Grandparents also allege that the District Court abused its discretion to join parties under Rule 19(a), M. R. Civ. P., by joining Father as a necessary party in this matter six-years after the District Court approved the parties' 2013 Agreement. We disagree. First, Title 40 of the Montana Code Annotated ("Family Law") requires that Father receive notice of all actions in parenting proceedings regarding K.J.C. and expressly requires his joinder as a party. *See* § 40-4-211(5), MCA (in all parenting proceedings, "[n]otice of a parenting proceeding must be given to the child's parent, guardian, caretaker, those persons with whom the child is residing, and all other contestants, who may appear, be heard, and file a responsive pleading." Second, Father's legal status as K.J.C.'s adoptive father makes him a "necessary" party to this dispute, as the dispute directly implicates his parenting rights over K.J.C. Therefore, the District Court did not abuse its discretion by joining him.

Furthermore, Grandparents contend that the District Court erred when it "concluded that Brian Chilcott's adoption of the child essentially voids the 2013 Agreement," and allege that the District Court cited no legal authority for this conclusion. The District Court, however, referenced Father's adoption of K.J.C. in the context of applying *Snyder*'s relevant standard for modification or termination of a grandparent visitation agreement. *Snyder* requires the court to determine a parent's fitness if a child's parent objects to an existing visitation agreement. *Snyder*, ¶ 21. Father, as a legal parent of K.J.C., presently objects to the Agreement along with Mother. The District Court held that Father's adoption of K.J.C. was relevant because, under *Snyder*, it would first "be required to find [Father] unfit as a parent" in order to avoid the constitutional presumption in favor of Father's wishes to terminate the Agreement. Because Grandparents failed to object to Father or Mother's fitness as parents, the District Court correctly applied *Snyder*'s standard of parental deference.

10

with the child . . . ." Section 40-9-102(1), MCA. Notably, this section grants to a parent who is deemed "fit" a presumption in favor of the parent's wishes. Section 40-9-102(4) provides:

> Grandparent-grandchild contact granted under this section over the objections of a fit parent may be granted only upon a finding by the court, based upon clear and convincing evidence, that the contact with the grandparent would be in the best interest of the child and that the presumption in favor of the parent's wishes has been rebutted.[3]

*See also Snyder*, ¶¶ 19-21 (setting forth the standard of parental deference to the wishes of a "fit" parent when that parent seeks to modify or terminate an existing § 40-9-102 grandparent visitation agreement).

¶22 Conversely, for agreements formed under § 40-4-228(2), a third-party who is a not a natural parent may seek a "parental interest" in a child provided that "the natural parent has engaged in conduct that is contrary to the child-parent relationship" and "the nonparent has established with the child a child-parent relationship, as defined in § 40-4-211, and it is in the best interests of the child to continue that relationship." Section 40-4-228(2), MCA. In contrast to grandparent visitation agreements, there is no presumption in favor of a fit parent's wishes. Although § 40-4-228(2)(a), MCA, requires that for a parental interest to be awarded to a nonparent a natural parent must have engaged in some conduct contrary to the child-parent relationship, subsection (5) specifically

---

[3] In its January 2020 order, the District Court acknowledged that its prior July 2013 order to approve the 2013 Agreement did not make a determination regarding Mother's parental fitness. However, § 40-9-102(2)-(4), MCA, clarify that this determination would only have been necessary had Mother objected to the Agreement at the time of its formation in 2013, which she did not. As a result, the District Court followed the proper statutory procedure for granting a legally enforceable grandparent visitation agreement under § 40-9-102.

11

provides that "[i]t is not necessary for the court to find a natural parent unfit before awarding a parental interest to a third party under this section." Section 40-4-228(5), MCA. Additionally, the applicable standard for modifying parenting plans which are established in § 40-4-228(2) is not provided by *Snyder*, but rather through § 40-4-219 setting forth the requirements for amending parenting plans. *See also Snyder*, ¶¶ 10-11 (affirming that § 40-4-219, MCA, is only properly applied to modify agreements that have awarded a parental interest to a third-party; thus, § 40-4-219, MCA, is not the applicable standard for modifying or terminating § 40-9-102 grandparent visitation agreements).

¶23 The parental interest statute contained at § 40-4-228 also permits third parties to seek visitation rights. However, in *In re the Parenting of L.R.S.*, 2018 MT 48, 390 Mont. 366, 414 P.3d 285, this Court was required to construe the statutory provisions of §§ 40-4-228 and 40-9-102, MCA, consistently together in order to give each effect. We held that a grandparent seeking court-ordered visitation with a child could do so only through an action brought under § 40-9-102 because § 40-9-102 was specific to grandparents. *L.R.S*, ¶ 12. Accordingly, we held "[n]ormal parenting plan standards do not apply to a grandparent's request for contact with his or her grandchild . . . ." *L.R.S.*, ¶¶ 10-12.

¶24 As the record demonstrates, the July 2013 order to adopt the Agreement—which was issued by the same judge who issued the January 2020 order to which Grandparents object—explicitly refers to the Agreement as a "visitation agreement" on three separate occasions. Grandparents argue that the Agreement's title is controlling. However, the term "parental interest" is entirely absent from the body of the Agreement itself and was not

12

employed by the District Court in the July 2013 order used to approve the Agreement. The language used by the District Court in its order approving the Agreement—and which gave the Agreement its legal effect— made clear the District Court's intention to interpret the Agreement as a visitation agreement.

¶25 The District Court was correct in its determination that the content of the Agreement dictates its classification as a grandparent visitation agreement formed under § 40-9-102, MCA, rather than an agreement giving Grandparents a parental interest. The Agreement's text explicitly grants Mother exclusive authority over all "[m]ajor [d]ecisions" involving K.J.C.—including "all medical decisions"—and further specifies that "[t]he minor child shall reside with [Mother]." Moreover, the Agreement's first page states that "[t]he parties realize that extended family contact is important to the child and this agreement is to set out an organized system to facilitate this contact." This statement appears well in advance of the Agreement's stipulated visitation schedule and indicates that the Agreement's express purpose was to facilitate said schedule. The Agreement's content only reinforces the District Court's conclusion that the Agreement was, in fact, a visitation agreement. Grandparents nonetheless argue that the Agreement provides Grandparents with parental functions, such as access to K.J.C.'s educational information and the ability to make emergency health care decisions for the child. However, Mother's agreement to allow for limited access to K.J.C.'s records to facilitate the Agreement's purpose and to provide for emergency health care decisions when K.J.C. was not in her care does not support Grandparents' contention that Mother's provisions for these limited contingencies created a parental interest.

13

¶26 Grandparents also argue that the Agreement, at its inception, met the requisite statutory criteria for a parental interest agreement, which requires that a "natural parent has engaged in conduct that is contrary to the child-parent relationship" and that "the nonparent has established with the child a child-parent relationship, as defined in [§] 40-4-211." Grandparents argue that their initial filing in this matter states their desire for a parental interest and asserts that they have established the requisite child-parent relationship with K.J.C. Grandparents argue that, under § 40-4-228(2), MCA, Mother admitted to the existence of a child-parent relationship and engaged in conduct that was contrary to the child-parent relationship by choosing to enter into the Agreement. However, the record demonstrates that, prior to entering into the Agreement, Mother filed a response to Grandparents' petition expressly disputing Grandparents' assertion that they had a child-parent relationship with K.J.C. Furthermore, the body of the Agreement does not acknowledge that Grandparents had a child-parent relationship with K.J.C., nor does it contain language supporting the notion that a child-parent relationship had been formed. We have little difficulty concluding that Mother never conceded to her parents' claim that the Agreement awarded them a child-parent relationship. Accordingly, Grandparents' argument that the Agreement, at its inception, met the statutory requirements to award a parental interest under § 40-4-228(2), MCA, fails.

¶27 Lastly, Appellants argue that the District Court erred by relying upon the wrong factual record to support its determination that the Agreement was a grandparent visitation agreement. Grandparents specifically allege the District Court's conclusion gave improper weight to the testimony provided at the parties' November 6, 2019 hearing. Instead,

14

Grandparents contend "[t]he factual basis to determine whether the 2013 judgment is a parental interest or a grandparent visitation order must be only those facts that were before the District Court in 2013." In support of this contention, Grandparents refer to § 40-4-211(6), MCA, governing the "commencement of parenting proceedings," which provides that, in the context of parenting proceedings, the nature of the child-parent relationship is defined by the facts that exist or existed "preceding the filing of this action." Grandparents argue that the 2013 record clearly demonstrates they "provided for all of the child's financial needs from the time of his birth in December 2011 until October 26, 2012" and, therefore, the 2013 record better supports their contention that the District Court awarded Grandparents a parental interest. Again, we disagree, and conclude the District Court did not err.

¶28 First, as has been explained, the content of the Agreement itself is consistent with the District Court's 2013 order adopting the Agreement as a grandparent visitation agreement. Second, § 40-4-211, MCA, governs the "commencement of parenting proceedings," and does not apply to proceedings such as here, which we have concluded involve grandparent visitation. The November 2019 hearings were conducted to assist the District Court in its rulings on Mother and Father's motion to terminate the Agreement, which the court concluded was a visitation and not a parental interest agreement. Moreover, we explained in *Snyder* that there are "myriad facts—some occurring before the entry of a grandparent-contact order, and some occurring after it—that may inform a parent's views on the prudence of continued contact with the nonparent . . . the parent must be allowed to present any evidence which bears on those decisions." *Snyder*, ¶ 19. Here,

15

the District Court's decision to grant modification or termination of the Agreement was necessarily intertwined with its determination of whether to classify the Agreement as establishing a parental interest or visitation agreement. The District Court did not err by considering the evidence presented at the November 2019 hearings in making its determination.

¶29 For these foregoing reasons, we affirm the District Court's interpretation of the Agreement as a grandparent visitation agreement formed under § 40-9-102, MCA.

¶30 *2. Did the District Court correctly apply the legal standard for termination of a § 40-9-102, MCA, grandparent visitation agreement?*

¶31 Having concluded that the District Court correctly determined the Agreement was a grandparent visitation agreement, we turn now to whether the District Court correctly terminated Grandparents' visitation. In *Snyder*, this Court held that in cases where there is a legally enforceable agreement between a parent and grandparents, a parent is nevertheless able to seek modification or termination of that agreement. *Snyder*, ¶ 19. *Snyder* acknowledged that § 40-9-102, MCA, "do[es] not expressly address [the procedure for] modifications to or terminations of a previously entered [grandparent] contact order . . . ." *Snyder*, ¶ 11. In recognition of this, *Snyder* turned to "the underlying constitutional principles and legislative intent" behind the enactment of § 40-9-102 and articulated a procedure for "modification or termination of an existing [grandparent] contact order." *Snyder*, ¶ 11. Because we have concluded the parties' Agreement was a grandparent visitation agreement, *Snyder* provides the applicable standard for its termination. Accordingly, this Court's review of the District Court's decision to terminate

16

the Agreement is limited to a review of whether the District Court applied the standard articulated in *Snyder* correctly.

¶32 We explained in *Snyder* that a court's decision to modify or terminate a grandparent visitation agreement is based on a determination of the child's "best interests" as follows:

> [T]he parent (as the moving party) has the burden to show that modification or termination is appropriate. See §§ 26-1-401, -402, MCA. However, we conclude that this showing must be made by a preponderance of the evidence, rather than clear and convincing evidence. Furthermore, in evaluating the evidence, a fit parent's estimation of her child's best interests is entitled to deference, and the judge may not disregard or reject a fit parent's views on continued visitation simply because he disagrees with them or thinks himself more enlightened than the parent. Finally, the parent is not required to establish that the previously ordered contact has, is, or will cause the child concrete harm. We reject the proposition that a child must suffer demonstrable harm as a result of the contact before the contact order may be modified or terminated . . .

*Snyder*, ¶ 19. Grandparents do not contest Mother or Father's fitness as parents in this matter. Because of this, *Snyder* grants deference to Mother and Father's position that terminating the Agreement would be in K.J.C.'s "best interests." Following a thorough review of the record, we agree with the District Court that Mother and Father established by a "preponderance of the evidence" that the Agreement was a hardship and burden on their family and, consequently, not in K.J.C.'s best interests either. Specifically, the Agreement required extensive travel by K.J.C. and his family, which resulted in significant disruption to the family's routine. Furthermore, we conclude that the District Court's findings that Mother and Father provided credible testimony regarding Grandparents' mental health and alcohol issues were not clearly erroneous. Finally, the District Court correctly noted that Grandparents were required to show by "clear and convincing

17

evidence" that the Agreement's termination was contrary to K.J.C.'s best interests. Section 40-9-102(4), MCA. We agree with the District Court's determination that Grandparents' arguments before the District Court—which centered around their contention that they had established a loving and caring relationship with K.J.C.—failed to meet this "clear and convincing" threshold. Accordingly, we conclude the District Court correctly applied *Snyder* when it granted Mother and Father's motion to terminate the Agreement.

**CONCLUSION**

¶33 We affirm the District Court's January 2020 order that the Agreement was a grandparent visitation agreement established under § 40-9-102, MCA. We further conclude that the District Court's January 2020 order terminating the Agreement correctly applied the correct legal standard for terminating a grandparent visitation agreement as set forth in *Snyder*. Finally, we deny Mother and Father's request for attorney fees as a sanction against Grandparents. [4]

/S/ LAURIE McKINNON

We concur:

/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR
/S/ JIM RICE

---

[4] Mother and Father have requested attorney fees incurred in this appeal pursuant to M. R. App. P. 19(5). We have considered their request and deem it inappropriate to award attorney fees. As such, we decline to award attorney fees as a sanction for Grandparents bringing this appeal.