# IN THE SUPREME COURT, STATE OF WYOMING

# 2023 WY 111

OCTOBER TERM, A.D. 2023

November 16, 2023

NICOLE WARD f/k/a NICOLE BELDEN
and ANDY WARD,

Appellants
(Respondents),

v.                                                    S-23-0007

BRETT BELDEN and ISABEL BELDEN,

Appellees
(Petitioners).

*Appeal from the District Court of Washakie County*
*The Honorable Bobbi Dean Overfield, Judge*

*Representing Appellant:*
Christopher M. Brennan, Woodhouse Roden Ames & Brennan, LLC, Cheyenne, Wyoming.

*Representing Appellee:*
Thomas P. Keegan, Keegan & Krisjansons, P.C., Cody, Wyoming.

*Guardian ad Litem:*
Amanda K. Roberts, Lonabaugh and Riggs, LLP, Sheridan, Wyoming.

*Before FOX, C.J., KAUTZ, BOOMGAARDEN, GRAY, and KASTE, D.J.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**KASTE, District Judge.**

[¶1]    Grandparents, Brett and Isabel Belden, were granted visitation with the children of their deceased son in 2019 after their relationship with the children's mother, Nicole Ward, deteriorated.  Following the adoption of the children in 2022 by their stepfather, Andy Ward, the Wards informed the Beldens that the Wards would no longer comply with the visitation order.  The Beldens moved to enforce the existing visitation order, and the Wards responded by filing a petition to modify the visitation order.  The district court held the Wards in contempt for failing to comply with the original visitation order and then, after a bench trial, issued an order modifying the Beldens' visitation to better accommodate the parties' current needs and obligations.  The Wards appealed from the order modifying visitation and we affirm.

## ISSUES

[¶2]    The Wards raise three issues, which we rephrase here.

I.      Does Mr. Ward have a due process right to relitigate the initial grandparent visitation order after the adoption because he was not a party to the original proceedings?

II.     Must a district court reapply the parental presumption when it considers a petition to revoke or amend a grandparent visitation order under Wyo. Stat. Ann. § 20-7-101(d)?

III.    Did the district court abuse its discretion when it amended the grandparent visitation order?

## FACTS

[¶3]    On December 7, 2016, Grant Belden passed away in an airplane crash, leaving behind his wife, Nicole Ward, formerly Nicole Belden, and two young children, CWB and DB born in 2012 and 2015 respectively.  Prior to Grant's untimely death, the family lived on a ranch in Thermopolis, Wyoming owned by Grant's parents, Brett and Isabel Belden.  Ms. Ward and the children continued to live on the Belden's ranch until a verbal altercation between Ms. Ward and Mr. Belden, concerning ownership of a gun built by Grant, caused her to move with the children to Worland, Wyoming in the spring of 2019.  Prior to this altercation, both CWB and DB had a close relationship with their grandparents.

[¶4]    Following the altercation, Ms. Ward began restricting contact between the children and Mr. Belden.  Soon after, Ms. Ward moved to Parkman, Wyoming to live with her then fiancé, Andy Ward.  Ms. Ward then cut all ties with her former friends and the children's entire paternal family in Thermopolis and prevented the Beldens from visiting the children.

1

In response, the Beldens filed an action to establish grandparent visitation rights in May 2019.

[¶5]    In March 2020, Ms. Ward, the Beldens, and the guardian ad litem agreed to a stipulated order which established grandparent visitation with the children.  The foundation of the stipulated order was the parties' agreement that "It is in the best interests of the minor children that they have reasonable visitation with their paternal grandparents."   The stipulated order included monthly weekend-long visits in Thermopolis, visits in Sheridan, and weekly phone calls between the children and grandparents.  The parties were required to meet at a half-way point to exchange the children, so they were each responsible for half the transportation costs.  The order also prohibited the parties from disparaging each other to ensure the children maintained healthy relationships with both parties.  The parties followed this schedule faithfully for the next year and a half.

[¶6]    In August 2021, Ms. Ward married Mr. Ward and soon afterward the Wards began limiting visitation with the Beldens.  Starting in November of 2021, the Wards gave numerous seemingly legitimate reasons for withholding visitation, including COVID-19 exposure and poor weather conditions.  However, some of these excuses appear to have been contrived.  For example, when the Beldens' were denied visitation because the children were allegedly quarantined for COVID-19, Ms. Ward took the children to the store, brought them on field trips with other children, and took them to the park to spend time with their maternal relatives.  While the Beldens were willing to reschedule the missed visits, Ms. Ward never rescheduled the visits.

[¶7]    On January 10, 2022, Mr. Ward adopted CWB and DB.  That same day he sent a letter to the Beldens stating, "On behalf of myself and Nicole Ward, we will no longer comply to the order of grandparent visitation[.]"  Mr. Ward then offered the Beldens three days of visitation each year sometime in the summer months in Sheridan and phone visits with the children but only if the children wished to speak to their grandparents.  He then threatened, "You can accept this offering and cooperate with us or get nothing and no visits."  Afterward, Ms. Ward openly refused to follow the order, and the Beldens did not have any visits with the children until April 2022.

[¶8]    In response, the Beldens filed a motion for order to show cause why Ms. Ward should not be held in contempt for violating the stipulated visitation order.  Ms. Ward responded by filing a motion to modify the grandparent visitation order.  After an evidentiary hearing, the district court held Ms. Ward in contempt, required her to resume visits required by the stipulated visitation order, and required her to make up the missed visits over the next two summers.  The district court then joined Mr. Ward as a necessary party and set the motion to modify the stipulated grandparent visitation order for a bench trial.

[¶9]     At the bench trial, the Beldens testified that they had several visits with the children following the contempt order and believed that the Wards were actively undermining the children's formerly healthy relationship with their grandparents.  The Beldens reported that, since the contempt order was entered, the children began calling home multiple times every day during visitation.  The Beldens believed the calls were encouraged by the Wards, and that the children's behavior would change negatively after each phone call.  The Beldens testified that the children had stopped calling them by their pet names, "Gippy" and "Gimmy," and now referred to them by their first names or as "the Beldens."  The district court received a video showing Mr. Ward telling the children, "We won't quit trying until we are successful" and "Marines never give up."  Mr. Ward testified that these statements referred to his goal of terminating visitation with the Beldens.

[¶10]  For their part, the Wards testified about how their circumstances had changed since the original stipulated visitation order had been entered.  Ms. Ward testified that most of their time was occupied by their duties at a restaurant they had purchased in Sheridan and with homeschooling CWB and DB.  The Wards testified that the children's homeschooling required them to attend extra events to socialize with other homeschooled children, and that these events generally conflicted with the Beldens' visitation schedule.  The Wards argued that the Beldens should be responsible for all the transportation for visitation to minimize interference with the Wards' work schedules.  The Wards also complained about the children missing social activities for the visits that took place after the contempt order.  The Beldens contended that they would have rescheduled their visits to times that were more convenient for the children, but they had not been informed of these activities.

[¶11]  The district court also conducted an in-camera interview with the oldest child, CWB.  He explained that his parents had told him that the Beldens had been cruel towards his deceased father, and that the Beldens were mean.  These comments and stories apparently had only been shared with him in the months leading up to trial.  The district court determined that the child had either been coached by the Wards, or that the Wards had done nothing to hide their animosity for the Beldens from the children.

[¶12]  In a thorough decision letter, the district court determined that the stipulated visitation order survived the children's adoption by Mr. Ward and that the Beldens were not required to overcome the parental presumption a second time in the modification proceedings.  The district court then determined that the Wards had not established good cause to revoke the stipulated visitation order but found good cause existed to amend the order to provide for less frequent visits and less travel on the part of the parents.  Accordingly, the district court entered an order modifying the original order that reduced the number of required visits and phone calls and shifted all responsibility for transportation to the Beldens.  The Wards appealed from this order.

**STANDARD OF REVIEW**

[¶13]   Following a bench trial in a grandparent visitation action, we review the district court's factual findings for clear error. *Bowman v. Study*, 2022 WY 139, ¶ 9, 519 P.3d 985, 988 (Wyo. 2022).

> While the factual findings of a judge are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record.  Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail reweighing disputed evidence.  ... A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.  We assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it.

*Id.* (citations and quotations omitted).  We review the district court's conclusions of law de novo.  *Id.*

**DISCUSSION**

*I. The grandparent visitation order survived Mr. Ward's adoption of the children.*

[¶14]   We most recently discussed the legal principles related to grandparent visitation proceedings in *Bowman*.  *Id.* ¶¶ 10–15, 519 P.3d at 988–990.  There we explained that "Any analysis of state-mandated grandparent visitation must start with the recognition that 'parents have a fundamental due process right to raise their children as they see fit and make decisions regarding their associations without interference from the government.'" *Id.* ¶ 10, 519 P.3d at 988 (quoting *Ailport v. Ailport*, 2022 WY 43, ¶ 8, 507 P.3d 427, 433 (Wyo. 2022)).  While Wyo. Stat. Ann. § 20-7-101(a) "confers grandparents a broad right to bring an action against parents to establish visitation with their grandchildren[,]" that right is limited by the parents' fundamental due process right.[1]

---

[1] Subsection (a) provides in relevant part:

> A grandparent may bring an original action against any person having custody of the grandparent's minor grandchild to establish reasonable visitation rights to the child. If the court finds, after a hearing, that visitation would be in the best interest of the child and that the rights of the child's parents are not substantially impaired, the court shall grant reasonable visitation rights to the grandparent.

[¶15]  To balance these competing rights, we have interpreted § 20-7-101(a) to require grandparents seeking visitation to prove by clear and convincing evidence that the parents are unfit or their visitation decision is harmful to the children. *Bowman*, at ¶ 13, 519 P.3d at 989.  This threshold requirement ensures the parents' decision is given the "special weight" necessary to satisfy due process required by the United States Supreme Court in *Troxel v. Granville*, 530 U.S. 57, 68–69, 120 S. Ct. 2054, 2061–62, 147 L.Ed.2d 49 (2000).  *Id.*  "Only after the grandparents have shown the parents are unfit or their visitation decision is harmful to the children will the presumption in favor of parental decision-making be overcome to allow the court to consider what visitation would serve the children's best interests." *Id.*

[¶16]  Once the parental presumption has been overcome and grandparent visitation has been established, section 20-7-101(d) governs the process for modifying an existing visitation order.  That subsection provides "In any action or proceeding in which visitation rights have been granted to a grandparent under this section, the court may for good cause upon petition of the person having custody or who is the guardian of the child, revoke or amend the visitation rights granted to the grandparent."  In addition, we have held that adoption can terminate a grandparent visitation order in certain circumstances.  Specifically, in *Hede v. Gilstrap*, we held that the grandparent visitation rights of the paternal grandparents terminated upon the adoption of the grandchildren by their maternal grandparents.  2005 WY 24, ¶ 40, 107 P.3d 158, 175 (Wyo. 2005).

[¶17]  In *Hede*, we explained that "adoption terminates the legal relationships between the biological family and the adopted child."  *Id.* at ¶¶ 24–25, 107 P.3d at 168–169 (citing *Matter of Adoption of RDS*, 787 P.2d 968, 970–71 (Wyo. 1990) and *In re Estate of Kirkpatrick*, 2003 WY 125, ¶¶ 12-17, 77 P.3d 404, 407–409 (Wyo. 2003)); *see also* Wyo. Stat. Ann. § 1-22-114(a) (providing that after adoption "the former parent, guardian or putative father of the child shall have no right to the control or custody of the child.  The adopting persons shall have all of the rights and obligations respecting the child as if they were natural parents.").  At that time, we noted "the adoption statutes unambiguously do not provide for biological grandparent intervention in adoption proceedings, nor for biological grandparent contesting of adoptions, nor for visitation after adoption."  *Id.* at ¶ 26, 107 P.3d at 169.

> The very fact that neither the adoption statutes nor the grandparent visitation statute specified that grandparent visitation orders survive adoption of the grandchild, coupled with the fact that the adoption statutes were not amended so as to provide for notice to grandparents or to provide that grandparents be made parties to an adoption, indicates the legislature's intent that grandparent visitation rights terminate upon adoption, just as the rights of any other biological family member.

5

*Id.* at ¶ 36, 107 P.3d at 174–175.

[¶18]   However, we also explained that "There is one section of the grandparent visitation statute that does directly reflect legislative intent as to the effect of adoption on grandparent visitation."   *Id.* at ¶ 29, 107 P.3d at 170.   At the time, Wyo. Stat. Ann. § 20-7-101(c) provided that "No action to establish visitation rights may be brought by a grandparent under subsection (a) of this section if the minor grandchild has been adopted and neither adopting parent is a natural parent of the child."   This provision created a limited exception for stepparent adoptions to the general rule that grandparent visitation cannot be ordered after adoption.   *Hede* ¶ 29, 107 P.3d. at 170.   Although the precise question was not before us, we strongly intimated that grandparent visitation rights survive a stepparent adoption. *Id.* at ¶¶ 29–30, 107 P.3d at 170.   In particular, we found "no compelling distinction between grandparent visitation rights that were ordered pre-adoption and those sought after adoption.   The relationship between the child and the grandparent is exactly the same in either case and the potential interference with the adoptive family also is exactly the same." *Id.* at ¶ 30, 107 P.3d at 170.   Conversely, we concluded that the existence of the exception for stepparent adoptions did not mean that grandparent visitation rights survived adoptions by someone other than a stepparent.   *Id.*

[¶19]   The legislature responded to our decision in *Hede* in 2007 by amending both the adoption and the grandparent visitation statutes.   2007 Session Laws Ch. 127.   First, the legislature required that every petition for adoption must contain "An affidavit stating the name or names of persons awarded visitation rights to the child under W.S. 20-7-101 or 20-7-102 or an affidavit stating that no visitation rights under W.S. 20-7-101 or 20-7-102 have been awarded in regard to the child."   Wyo. Stat. Ann. § 1-22-104(c)(v).   Second the legislature required:

> Prior to the hearing a copy of the petition to adopt a child and an order to show cause shall be served on any persons awarded visitation rights to the child under W.S. 20-7-101 or 20-7-102. The consent of persons awarded visitation rights to the adoption is not required.   However, the court may exercise its discretion to allow those persons an opportunity to be heard if the court finds it to be in the best interest and welfare of the child.

Wyo. Stat. Ann. § 1-22-107(c).   Finally, the legislature extended the limited exception for stepparent adoptions in § 20-7-101(c) to situations where "neither adopting parent is related by blood to the child."   Thus, grandparents, like those in *Hede*, are now permitted to seek visitation with their grandchildren after an adoption by a stepparent or a family member.

[¶20]   When the legislature granted these new rights, it could have established a general rule that all grandparent visitation rights survive every adoption or that none do.   But it

6

chose not to adopt either of those general rules. In our view, this confirms the legislature's intent to adhere to the dichotomy that we identified in *Hede*. Absent a general rule of survival, adoptions by those who are not stepparents or family members continue to terminate existing grandparent visitation rights. Conversely, absent a general rule terminating grandparent visitation after any adoption, existing grandparent visitation rights survive adoptions by stepparents and family members.[2]

[¶21] To be clear, we now state explicitly what we strongly intimated in *Hede* that grandparent visitation rights survive adoptions that fall within the expanded but still limited exception of § 20-7-101(c). We continue to see "no compelling distinction between grandparent visitation rights that were ordered pre-adoption and those sought after adoption." *Hede*, ¶ 30, 107 P.3d at 170.

## II. Precluding Mr. Ward from relitigating the original order does not violate due process.

[¶22] Mr. Ward was not a party to the stipulated visitation order entered before he married Ms. Ward and adopted the children. Accordingly, he claims that his due process rights were violated when the Beldens were not required to overcome the parental presumption a second time in this case by showing that he is an unfit parent or that his visitation decision will be harmful to the children. However, because the stipulated visitation order survived the stepparent adoption by Mr. Ward, his due process claim necessarily requires that we consider whether he is precluded from relitigating the claims or issues in that earlier proceeding. We find that Mr. Ward is precluded from relitigating whether the parental presumption has been overcome. We further conclude that such preclusion comports with due process.

[¶23] "The doctrines of res judicata (claim preclusion) and collateral estoppel (issue preclusion) incorporate a universal legal principle of common-law jurisprudence to the effect that a right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction … cannot be disputed in a subsequent suit between the same parties or their privies." *Wyoming Dep't of Revenue v. Exxon Mobil Corp.*, 2007 WY 112, ¶ 17, 162 P.3d 515, 522 (Wyo. 2007) (internal quotations omitted). Collateral estoppel does not apply here because the original visitation order was a consent judgment. *See, e.g.*, *Markstein v. Countryside I, L.L.C.*, 2003 WY 122, ¶25, 77 P.3d 389, 397 (Wyo. 2003) (explaining that consent judgments ordinarily will not support collateral estoppel unless

---

[2] We note that other legislatures have drawn the same line and authorize survival of grandparent visitation rights after adoption by a stepparent or family member. *See, e.g., Pier v. Bolles*, 596 N.W.2d 1, 6-7 (Neb. 1999); *State ex rel. Brandon L. v. Moats*, 551 S.E.2d 674, 679 (W. Va. 2001); *Kanvick v. Reilley*, 760 P.2d 743 (Mont. 1988); *Mimkon v. Ford*, 332 A.2d 199 (N.J. 1975); *Hedrick v. Hedrick*, 368 S.E.2d 14 (N.C. App. 1988); *In re Marriage of Aragon*, 764 P.2d 419 (Colo. Ct. App. 1988); *In re Groleau*, 585 N.E.2d 726 (Ind. Ct. App. 1992); *Howell v. Rogers*, 551 So.2d 904 (Miss. 1989); and *Rigler v. Treen*, 660 A.2d 111 (Pa. Super. 1995).

7

the agreement clearly expresses the intention of the parties to by bound in further proceedings). However, a consent judgment will ordinarily support res judicata or claim preclusion. *Id.* "Res judicata may be applied where four factors are found to exist: (1) identity in parties; (2) identity in subject matter; (3) the issues are the same and relate to the subject matter; and (4) the capacities of the persons are identical in reference to both the subject matter and the issues between them."[3] *Exxon Mobil Corp.*, ¶ 18, 162 P.3d at 522.

[¶24] We find that each of the four factors exist here. First, there is identity in parties because we conclude the Wards are privies.

> Privity signifies that the relationship between two persons is such that a judgment involving one of them is conclusive upon the other, although the other was not a party to the suit. However, privity is not established from the mere fact that persons may happen to be interested in the same question or in proving or disproving the same state of facts. Examples of legal relationships that bind a nonparty to an earlier judgment are preceding and succeeding owners of property, bailors and bailees, assignors and assignees and nonparties who are adequately represented by someone with the same interests who was a party.

*Casiano v. State ex rel. Wyoming Dep't of Transp.*, 2019 WY 16, ¶ 15, 434 P.3d 116, 121 (Wyo. 2019) (cleaned up). Determining privity generally requires a careful examination of the circumstances of each case as it arises.

[¶25] Here we believe that Mr. Ward is in privity with Ms. Ward with regard to the initial threshold application of the parental presumption. We reach this conclusion not because they are spouses, as there are many circumstances where spouses are not in privity with each other. *See, e.g.*, *Worman v. Carver*, 2002 WY 59, ¶¶ 29, 34, 44 P.3d 82, 89–90 (Wyo. 2002) (finding wife to be in privity and not in privity with husband on different claims). Rather, we find these particular spouses in privity because they share the same interests in the initial application of the parental presumption. They also share the same interests in the best interests of the children and the same interests in exercising their now shared parental authority over the children. We see no good reason why the earlier judgment should not be conclusive as against Mr. Ward, and this is particularly true where he had

---

[3] Of course, the prior proceeding must also have been terminated with a final or appealable order. *Womack v. Swan*, 2018 WY 27, ¶ 17, 413 P.3d 127, 135 (Wyo. 2018). Here the prior proceedings resulted in a stipulated order which satisfies this requirement. *See Wilson v. Lucerne Canal & Power Co.*, 2007 WY 10, ¶ 23, 150 P.3d 653, 662 (Wyo. 2007) (explaining that consent decrees are the equivalent of litigated judgments for purposes of res judicata).

specific notice, both by statute and in fact, of the stipulated visitation order before he adopted the children.

[¶26] We also find that Mr. Ward was adequately represented in the prior proceedings by Ms. Ward. In those proceedings, she had an identical incentive to protect her parental right to make decisions for her children. She also had a full and fair opportunity to litigate the establishment of grandparent visitation and that opportunity was unaffected by her choice to voluntarily settle the case prior to trial. *See, e.g., Hamaker v. Seales*, 227 So.2d 32, 38– 39 (Ala. Civ. App. 2016) (explaining that father exercised his parental rights by voluntarily agreeing to grandparent visitation). Ms. Ward chose to exercise her fundamental right to make decisions for her children by voluntarily agreeing to the Beldens' request for visitation and we do not believe Mr. Ward should be permitted to second guess her choice and upset that voluntary settlement. *See, e.g., Haderlie v. Sondgeroth*, 866 P.2d 703, 711 (Wyo. 1993) (noting Wyoming has long recognized a strong public policy in favor of settlement of litigation).

[¶27] This conclusion also comports with the statutes governing adoption. When a parent adopts a child, he takes that child as he finds them. The adopting parents "shall have all of the rights and obligations respecting the child as if they were natural parents." Wyo. Stat. Ann. § 1-22-114(a). The grandparent visitation order was a preexisting obligation and Mr. Ward adopted the children subject to that obligation. At the moment of adoption his right to contest the order was limited to filing a petition to revoke or amend the order under § 20-7-101(d) just like the children's natural parent.

[¶28] The remaining elements are easily met. The subject matter and the specific issue in the original proceedings are identical to the subject matter and issue Mr. Ward would like to litigate here. Whether the Beldens have overcome the parental presumption by showing parental unfitness or that the parent's visitation decision will be harmful to the children and what visitation would serve the children's best interests are the identical issues that were before the court in the initial proceedings. In fact, Mr. Ward explicitly asserts that he is seeking to require the Beldens to prove again the elements of the claim in which they previously prevailed to reestablish their entitlement to visitation. Finally, both of the Wards are acting in this litigation in their now shared capacity as parents. Because all four elements are present here, res judicata bars Mr. Ward from relitigating the initial threshold application of the parental presumption.

[¶29] Mr. Ward's due process rights are not violated by this result. Generally, application of the preclusive doctrines of res judicata and collateral estoppel are consistent with due process. In fact, we routinely apply res judicata to modifications of child custody and visitation orders.[4] However, we have warned that "[E]xtreme applications of the doctrine

---

[4] *See Willis v. Davis*, 2013 WY 44, ¶6, 299 P.3d 88, 91 (Wyo. 2013) ("If a material change in circumstances cannot be shown, the doctrine of res judicata applies to the original [custody or visitation] order."); *Kappen*

of res judicata may be inconsistent with a federal right that is 'fundamental in character.'" *Himes v. Petro Eng'g & Const.*, 2003 WY 5, 61 P.3d 393, 400 n.4 (Wyo. 2003). We see nothing extreme about holding this married parent to the choices of his spouse as it relates to the care and custody of their children. Moreover, "[t]he touchstones of due process are notice and the opportunity to be heard." *ELA v. AAB*, 2016 WY 98, ¶ 21, 382 P.3d 45, 50 (Wyo. 2016). Ms. Ward had a full and fair opportunity to be heard in the prior proceedings, Mr. Ward had notice of the prior order before he adopted the children, and he had an opportunity to be heard on his petition to modify. We see no reason why Mr. Ward would be entitled to more process here.

### III. The parental presumption is not applicable in actions to revoke or amend.

[¶30] The Wards next contend that the district court erred when it failed to apply the parental presumption to their motion to modify the stipulated visitation order. In essence, they contend that they have a right to the parental presumption anytime visitation is either established or modified. We disagree.

[¶31] We begin by noting that § 20-7-101(d) governs modifications and it sets forth a different standard than subsection (a) which governs the establishment of visitation orders. In particular, subsection (a), consistent with *Troxel*, requires the **grandparents** to show "that the rights of the child's parents are not substantially impaired" by granting visitation. Wyo. Stat. Ann. § 20-7-101(a). By contrast, subsection (d) requires the **parents** to show that "good cause" exists to modify the prior order. Wyo. Stat. Ann. § 20-7-101(d). The burden of proof is both explicitly different and vested in different parties. It would be inconsistent with the plain language of the statute to impose the additional requirement of overcoming the parental presumption again before requiring the parents to meet their burden of proof under subsection (d). In fact, subsection (d) would make little sense if a parent seeking modification could simply file a petition and then prevail without ever meeting their statutorily assigned burden.

[¶32] We next note that both *Troxel* and our own decision in *Ailport* interpreting § 20-7-101 in light of *Troxel* involved the establishment of grandparent visitation. 530 U.S. at 61, 120 S. Ct. at 2057; *Ailport*, ¶ 4, 507 P.3d at 431-432. Neither of these decisions considered modification proceedings and, therefore, shed no light on the issue. Other courts that have considered the issue have reached different conclusions.

---

*v. Kappen*, 2015 WY 3, ¶¶12–14, 341 P.3d 377, 381-382 (Wyo. 2015) ("The doctrine of res judicata has been 'functionally incorporated as a threshold inquiry under Wyo. Stat. Ann. § 20-2-204(c).") (cleaned up); *Taulo-Millar v. Hognason*, 2022 WY 8, ¶18, 501 P.3d 1274, 1280 (Wyo. 2022) ("Res judicata prohibits a district court from modifying a previous custody or visitation order absent a material change in circumstances.") (quotations omitted).

[¶33] A few courts have reapplied the parental presumption in actions to modify or terminate grandparent visitation rights. *See, e.g., Snyder v. Spaulding*, 235 P.3d 578, 584 (Mont. 2010); *In re A.M.*, 251 P.3d 1119, 1120 (Colo. Ct. App. 2010); *Barrett v. Ayres*, 972 A.2d 905, 914 (Md. App. 2009). This approach treats the parental presumption as a perpetual shield standing between the parents and the state which must be overcome before the state may take any action that would restrict the rights of a parent to be the primary decision-maker. As the Supreme Court of Montana explained, "[T]he constitutional rights discussed in *Troxel* … do not simply evaporate because a contact order has been issued. The parent still retains her fundamental right to make decisions concerning the care, custody, and control of her children." *Snyder*, 235 P.3d at 584. "[A] fit parent's estimation of her child's best interests is entitled to deference, and the judge may not disregard or reject a fit parent's views on continued visitation simply because he disagrees with them or thinks himself more enlightened than the parent." *Id.*

[¶34] A larger group of courts have reached the opposite conclusion.[5] Many of these courts have concluded that reapplication of the parental preference in subsequent proceedings would render the initial order illusory. *See, e.g.*, *Slawinski*, 150 A.3d at 414 ("once a parent enters into a consent order governing grandparent visitation, the parent may not unilaterally withdraw or require the grandparent to establish a right to visitation as if there had been no order at all."); *Albert*, 613 S.E.2d at 869–70 ("To allow a natural parent to unilaterally rescind a judicially sanctioned consent decree establishing the custodial rights of the parties involved would render all such custody decrees void and unenforceable."). More importantly, while these courts have recognized the interests of the parents, they have placed greater weight on the superior interests of the children in stability. "Declining to apply the presumption of superior parental rights in a modification proceeding not only gives deference to a court's order, but it also promotes the important policy goal of stability for the child." *Lovlace*, 418 S.W.3d at 31 (citations and quotations omitted).

---

[5] *See, e.g., Lovlace v. Copley*, 418 S.W.3d 1, 31 (Tenn. 2013) ("Once grandparents have obtained court-ordered visitation, however, the presumption of superior parental rights does not apply in proceedings to modify or terminate grandparent visitation."); *Rennels v. Rennels*, 257 P.3d 396, 401, n.5 (Nev. 2011) ("When a nonparent obtains visitation through a court order or judicial approval, they have successfully overcome the parental presumption and are in the same position as a parent seeking to modify or terminate visitation."); *Ingram v. Knippers*, 72 P.3d 17, 22 (Okla. 2003) ("While a fit parent contesting grandparental visitation is entitled to a presumption that the parent will act in the best interest of the child, … a court will not modify a valid visitation order without the moving party first showing a substantial change of circumstances." (internal citation omitted)); *Slawinski v. Nicholas*, 150 A.3d 409, 414 (N.J. App. Div. 2016) ("[M]odification of a consent order governing grandparent visitation must be considered according to the same … changed circumstances framework applicable to other custody and visitation orders."); *Albert v. Ramirez*, 613 S.E.2d 865, 870 (Va. App. 2005) ("Requiring the party seeking a modification of a valid custody or visitation decree to prove a material change of circumstances justifying the modification is not inconsistent with or anathema to a parent's constitutional rights as enunciated in *Troxel*."); *Deem v. Lobato*, 96 P.3d 1186, 1191 (N.M. Ct. App. 2004) ("*Troxel* does not shift the burden away from a parent who seeks to modify an existing order granting grandparent visitation.").

[¶35] We choose to follow the majority of courts that have considered the issue and hold that the parental presumption does not apply when a court considers a petition to revoke or amend a grandparent visitation order under Wyo. Stat. Ann. § 20-7-101(d). Wyoming places the best interests of the child above all other matters in custody and visitation disputes. For example, we have held that "the best interests of the children are of overriding importance, and that they take precedence over the fundamental rights of parents." *Arnott v. Arnott*, 2012 WY 167, ¶ 31, 293 P.3d 440, 454 (Wyo. 2012). In this regard, we have recognized that "stability in a child's environment is of utmost importance to the child's well-being [and] changes in custody are not favored and should not be granted except in clear cases." *Kappen v. Kappen*, 2015 WY 3, ¶ 12, 341 P.3d 377, 382 (Wyo. 2015) (cleaned up). We decline to allow dissatisfied parents to relitigate the very foundation of visitation orders that have been determined to be in the child's best interests.

[¶36] Instead, we believe that requiring the parents to establish that "good cause" exists to revoke or amend a petition appropriately balances the interests of all parties. Wyo. Stat. Ann. § 20-7-101(d). Neither the legislature nor this Court has defined what constitutes good cause under § 20-7-101(d). Good cause can mean different things in different circumstances. *See, e.g.*, *Schneider v. State*, 2022 WY 31, ¶ 14, 505 P.3d 591, 596 (Wyo. 2022) (defining good cause under Wyo. Stat. Ann. § 31-5-233(f)(v) as requiring a driver to demonstrate that he would no longer present a threat to public safety if he were permitted to drive without an interlock device). Here the district court looked to the familiar "material change of circumstances" and "best interests" standard set forth in Wyo. Stat. Ann. § 20-2-204(c) to consider whether the Wards had established good cause to revoke or amend the order. We think this approach is sound.

[¶37] Other courts have required similar showings and concluded that imposing this burden on the parents did not impair their fundamental rights. For example, the court in *Lovlace*, held "that when a grandparent or a parent initiates a proceeding to modify or terminate court-ordered grandparent visitation, the burdens of proof and the standards to be applied are the same as those typically applied in parent-vs-parent visitation modification cases." 418 S.W.3d at 30. That court went on to explain that "Our holding should not be viewed as retreating from prior decisions recognizing the fundamental right of parents to the care and custody of their children." *Id.* We agree and hold that when a parent seeks to amend or revoke a grandparent visitation order they demonstrate good cause under § 20-7-101(d) by showing "a material change of circumstances since the entry of the order in question and that the modification would be in the best interests of the children[.]" Wyo. Stat. Ann. § 20-2-204(c).

[¶38] Accordingly, the district court properly rejected the Ward's request to reapply the parental preference and properly applied the good cause standard set forth in § 20-7-101(d) in these modification proceedings.

12

***IV. The district court did not abuse its discretion when it modified the visitation order.***

[¶39] The Wards next assert the district court abused its discretion in modifying the visitation order because it failed to address the concerns they raised at trial. Again, we disagree.

> We review a district court's decision on a petition to modify child custody for an abuse of discretion. We will not disturb the decision absent a procedural error or a clear abuse of discretion. Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means exercising sound judgment with regard to what is right under the circumstances and without doing so arbitrarily or capriciously.

*Evans v. Sharpe*, 2023 WY 55, ¶ 25, 530 P.3d 298, 307 (Wyo. 2023) (cleaned up).

[¶40] The district court agreed with the Wards that there had been a material change in circumstances and, therefore, the court was free to reassess the best interests of the children. In its decision letter, the district court recounted in detail the Ward's assertions that their work at the restaurant, the children's homeschooling, together with their extra events and social activities, made visitation inconvenient. The district court also noted the Ward's concerns that the travel times and length of visits were too long and their argument that Beldens should bear all the costs of transportation for visitation. Finally, the district court took due notice of the burden the original visitation order placed on the Wards and the difficulty they had complying with its terms. Then the district court modified the visitation order to accommodate all of these concerns by reducing the number of required visits and phone calls, and shifting all responsibility for transportation to the Beldens. In fact, the once generous visitation schedule was cut roughly in half. The modified order takes into account the busy schedules of the Wards, the needs and sensitivities of CWB and DB, and the interests of the Beldens in maintaining a relationship with the children of their deceased son.

[¶41] It seems the Wards' real complaint is that the district court did not adopt the more restrictive visitation schedule that they had proposed. But a litigant's mere dissatisfaction with an order does not establish an abuse of discretion. The district court addressed all the Ward's complaints about visitation and did so in an extremely thoughtful manner calculated to reduce the persistent animosity that the Wards have shown towards the Beldens.

## CONCLUSION

[¶42]   The stipulated grandparent visitation order survived Mr. Ward's adoption of CWB and DB and Mr. Ward was not free to relitigate the claims addressed in that order. Precluding him from relitigating those claims does not violate his due process rights. Instead, he and his wife had a right to petition to amend or revoke that order under § 20-7-101(d), although they were not entitled to the parental presumption in those proceedings. In those proceedings, the Wards were required to demonstrate that good cause existed to revoke or modify the original order, and while they demonstrated that there had been a material change in circumstances, they failed to show that the order should be revoked. The modified order fairly addressed the concerns the Wards raised at trial and the district court did not abuse its discretion by failing to give the Wards the visitation schedule they preferred.

[¶43]   Affirmed.