# IN THE SUPREME COURT, STATE OF WYOMING

# 2025 WY 65

APRIL TERM, A.D. 2025

June 13, 2025

SALVADOR GALVAN,

Appellant
(Respondent),

v.

S-24-0240

SANDRA MALONE,

Appellee
(Petitioner).

*Appeal from the District Court of Albany County*
*The Honorable Misha E. Westby, Judge*

*Representing Appellant:*
    Erik Oblasser, Corthell and King Law Office, P.C., Laramie, Wyoming.  Argument by Mr. Oblasser.

*Representing Appellee:*
    JoAnn Fulton, Fulton Law Office, P.C., Laramie, Wyoming.  Argument by Ms. Fulton.

*Before BOOMGAARDEN, C.J., and FOX,* * GRAY, FENN, and JAROSH, JJ.*

* Justice Fox retired from judicial office effective May 27, 2025, and, pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (2023), she was reassigned to act on this matter on May 28, 2025.

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third.  Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]   Sandra Malone (Grandmother) filed an action against Salvador Galvan (Father) seeking visitation with ALG, the child of her deceased daughter.  The district court held a trial and granted Grandmother visitation.  We reverse.

## *ISSUE*

[¶2]   Did the district court violate Father's constitutional rights as a parent when it established grandparent visitation pursuant to Wyo. Stat. Ann. § 20-7-101?

## *FACTS*

[¶3]   Father and Mother met in 2018, began dating, and moved in together.  In July 2022, they had a child, ALG.  From early in their relationship, Father and Mother attended weekly Sunday dinners with Mother's family.  After ALG was born, they brought him to the family dinners.

[¶4]   Over time, Father developed relationships with various members of Mother's family, including Mother's brother, his wife, their seven-year-old child, and Mother's grandmother, ALG's great-grandmother.  While Grandmother also attended these family dinners, Father felt that Grandmother did not like him or welcome him, and he never developed a close relationship with her.

[¶5]   In June 2023, Father and Mother were injured in an ATV accident.  At the time of the accident, Father was driving the ATV under the influence of alcohol.  Mother's injuries resulted in her death.  Shortly after the accident, Grandmother sent Father a text accusing him of killing Mother.  Father was criminally charged with Mother's death, a prosecution supported by Grandmother.  Father entered a guilty plea in the criminal matter.  In her victim impact statement written prior to Father's criminal sentencing hearing, Grandmother asked the court to sentence Father to jail time.  Grandmother also disparaged Father to family members and others and, at the trial in this matter, reported that she is considering filing a wrongful death action against Father.

[¶6]   Father, concerned about how Grandmother's interactions with him would impact ALG, stopped attending Sunday dinners, and Father discontinued visits between ALG and Grandmother.  In total, Father and ALG attended three family dinners after Mother's death.  Father continues to maintain relationships and visits with other members of Mother's family.

1

[¶7]    Grandmother sued Father, seeking grandparent visitation of ALG pursuant to Wyo. Stat. Ann. § 20-7-101.[1]   The district court held a trial on the matter.   At the trial, Grandmother testified that prior to Mother's death, she spent time with ALG at Sunday dinners, on holidays, and family birthdays.   She also testified that she was occasionally called on short notice to care for ALG during the week, she saw him on most Saturdays, and she cared for him overnight on two occasions when Mother and Father went out of town.[2]

[¶8]    Michael McGee, a clinical mental health counselor and Father's witness,[3] testified that a positive relationship between Father and Grandmother would be necessary before visitation between Grandmother and ALG would be beneficial and not harmful to ALG. He testified that a positive relationship between Father and Grandmother would also be necessary before visitation would not be harmful to Father and ALG's parent/child relationship.   He testified that ALG did not have a "significant" relationship with Grandmother, given the child's young age and the amount of time the child had spent with her.   Grandmother did not present a witness to testify regarding harm.

[¶9]    The district court orally ruled from the bench.   It found Grandmother had not shown by clear and convincing evidence that Father was unfit as a parent or unfit to make visitation decisions.   It then found that Father's visitation decision—not allowing ALG to have contact with Grandmother—was harmful to ALG.   Finally, although the district court referenced a best interests analysis, it failed to identify any best interest factors or analyze

---

[1] Wyo. Stat. Ann. § 20-7-101(a) provides:

> A grandparent may bring an original action against any person having custody of the grandparent's minor grandchild to establish reasonable visitation rights to the child.   If the court finds, after a hearing, that visitation would be in the best interest of the child and that the rights of the child's parents are not substantially impaired, the court shall grant reasonable visitation rights to the grandparent.   In any action under this section for which the court appoints a guardian ad litem, the grandparent shall be responsible for all fees and expenses associated with the appointment.

Wyo. Stat. Ann. § 20-7-101(a) (LexisNexis 2023).

[2] There were discrepancies in the parties' testimony regarding the number of times ALG visited Grandmother.   For example, Grandmother testified she saw ALG "almost every" Saturday morning and a "few Sundays here and there."   Father disagreed with Grandmother regarding visits on Saturdays, saying her testimony was "just not true."   Father testified that other than Sunday dinners and the two times ALG spent the night at Grandmother's, she took care of him two other times.   The district court found Grandmother "saw the baby on some Saturday mornings . . . ."  We assume all facts in favor of Grandmother to be true.  *Ward v. Belden*, 2023 WY 111, ¶ 13, 538 P.3d 980, 985 (Wyo. 2023).

[3] Father retained Mr. McGee as an expert witness and then expressly requested the district court qualify him as such.   The district court did not formally qualify him as an expert but stated it would "consider [his] testimony after it's presented and make a determination at that point in time."   The district court never elaborated on the issue of Mr. McGee as an expert but did rely on portions of his testimony in its decision.

2

ALG's best interests. The district court awarded visitation to Grandmother.[4] Father appeals. Additional facts are discussed below.

## STANDARD OF REVIEW

[¶10] We review the district court's factual findings after a bench trial for clear error. *Ward v. Belden*, 2023 WY 111, ¶ 13, 538 P.3d 980, 985 (Wyo. 2023).

> While the factual findings of a judge are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail reweighing disputed evidence. . . . A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. We assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it.
>
> We review the district court's conclusions of law de novo.

*Id.* (quoting *Bowman v. Study*, 2022 WY 139, ¶ 9, 519 P.3d 985, 988 (Wyo. 2022)).

## DISCUSSION

[¶11] The issue presented in this case is whether the district court violated Father's constitutional rights as a parent when it established grandparent visitation pursuant to Wyo. Stat. Ann. § 20-7-101. Resolution of this issue requires determination of whether the district court clearly erred when it found Grandmother established by clear and convincing evidence that Father's decision to suspend Grandmother's visitation with ALG harmed the child.

[¶12] Wyo. Stat. Ann. § 20-7-101(a) gives grandparents the right to bring an action against parents to establish visitation with their grandchildren. This right is tempered by parents' fundamental due process right "to raise their children as they see fit and make decisions regarding their associations without interference from the government." *Bowman*, ¶¶ 10–

---

[4] The district court ordered two hours of visitation every other week for six months, four hours every other week for the next six months, and after one year, one monthly overnight visit alternating with monthly four-hour visits. The district court also ordered two hours of visitation on Christmas Day or Christmas Eve.

12, 519 P.3d at 988–89 (quoting *Ailport v. Ailport*, 2022 WY 43, ¶¶ 8, 29–30, 507 P.3d 427, 433, 438–39 (Wyo. 2022)).

[¶13] To prevail in an action seeking grandparent visitation, "grandparents must demonstrate the state has a compelling reason to interfere with the parents' rights." *Bowman*, ¶ 13, 519 P.3d at 989 (citing *Ailport*, ¶ 30, 507 P.3d at 439). This "requires proof by clear and convincing evidence 'the parents are unfit or their visitation decision is harmful to the child[ren]. This threshold requirement ensures the parents' decision is given "special weight" in accordance with [the United States Supreme Court's] *Troxel*[] [*v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)] directive.'" *Bowman*, ¶ 13, 519 P.3d at 989 (quoting *Ailport*, ¶ 30, 507 P.3d at 439). "Only after the grandparents have shown the parents are unfit or their visitation decision is harmful to the children will the presumption in favor of parental decision-making be overcome to allow the court to consider what visitation would serve the children's best interests." *Id.* (citing *Ailport*, ¶ 21, 507 P.3d at 437).

[¶14] The district court concluded Grandmother did not prove by clear and convincing evidence that Father was unfit[5] and turned to the question of whether Grandmother established by clear and convincing evidence that Father's visitation decision was harmful to ALG.

[¶15] In *Bowman*, we discussed the type of visitation decision that might establish harm to the children. We said,

> Representative "**examples of evidence which might, under the specific circumstances of a given case, establish harm, includ[e] when a surviving parent restricts a child's contact with grandparents after the death of a parent**, the breakup of the child's home through divorce or separation,

---

[5] At trial, Grandmother conceded that Father is not an unfit parent. Grandmother argues that the proper inquiry is not whether Father was unfit but whether Father was unfit to make visitation decisions for ALG. She cites *Ailport*, where we quoted *In re Adoption of C.A.*, a Colorado case, which stated that the

> presumption that parental determinations about grandparent visitation are in the child's best interests . . . is rebuttable . . . when the grandparent [establishes] clear and convincing evidence . . . that the parent is unfit to make the grandparent visitation decision, or that the visitation determination the parent has made is not in the best interests of the child.

*Ailport*, ¶ 17, 507 P.3d at 435–36 (quoting *In re Adoption of C.A.*, 137 P.3d 318, 327–28 (Colo. 2006)). In *Ailport*, we rejected Colorado's approach, referring to a "second approach" applying "traditional strict scrutiny due process review." *Ailport*, ¶ 18, 507 P.3d at 436. We held, "Grandparents must overcome the presumption in favor of parental decision-making and establish the state has a compelling interest in granting grandparent visitation. To do so, they must show **the parents are unfit or the child is or will be harmed by the denial of visitation**." *Id.* (citations omitted). Grandmother did not appeal the district court's decision regarding unfitness, and we do not address it further.

4

and/or the termination of a long-standing relationship between the grandparents and the child." [*Ailport*], ¶ 20, 507 P.3d at 436 (citing *Moriarty* [*v. Bradt*], 827 A.2d [203,] 223–24 [(N.J. 2003)]). Another factor in determining whether the parents' visitation decision is harmful to the children is whether the parents terminated all visitation between the grandparents and the children. *Id.* ¶ 42, 507 P.3d at 441–42 ("When viewed within the paradigm we have adopted to protect parents' fundamental right to rear their children, the fact [p]arents had not denied visitation to [g]randparents was a valid consideration in determining whether [c]hildren were harmed by [p]arents' visitation decisions." (citing *Moriarty*, 827 A.2d at 224)).

*Bowman*, ¶ 14, 519 P.3d at 989–90 (emphasis added).

[¶16]   The district court, presumably relying on *Bowman*, stated, "In terms of instances where the Court will make a finding that grandparent visitation is appropriate over the objection of the parent is the death of one of the parents and clearly that is what happened in this case." However, restricting visitation following the death of a parent does not, standing alone, establish harm. *Bowman* mandates an inquiry into the "specific circumstances" of the case. *Bowman*, ¶ 14, 519 P.3d at 989.

[¶17]   The district court cited to some of the specific circumstances of the case—Father caused Mother's death, Grandmother's animosity toward Father, at least some of which existed from the beginning of his relationship with Mother, Grandmother's anger toward Father because of the accident that caused Mother's death, and the possibility of a wrongful death lawsuit—and concluded that these "circumstances . . . **do not establish that it would be harmful for the child to have visitation with the grandmother**." (Emphasis added.) This misstates Grandmother's burden—she was required to prove by clear and convincing evidence that **a lack of visitation would be harmful to ALG**. *Bowman*, ¶ 13, 519 P.3d at 989 ("[T]he grandparents must demonstrate . . . by clear and convincing evidence '[Father's] visitation decision is harmful to the child[].'"). The district court did conclude that Father's "visitation decision to discontinue visits entirely with [Grandmother] and in large part with mother's family . . . although there have been sporadic visitations . . . is harmful to the child," and Grandmother had a "significant preexisting relationship with the child." The district court's conclusion that Father discontinued visitation with Mother's family is not supported by the record. Evidence, taken in the light most favorable to Grandmother, revealed that Father accepted invitations for him and ALG to visit from maternal great-grandmother and maternal uncle's family every time they asked.

5

Grandmother offered no evidence regarding whether Father's visitation decision harmed ALG,[6] and none of the evidence cited by the district court goes to this question.

---

[6] In reaching its conclusion, the district court also relied on its personal understanding of "reactive attachment disorder" to conclude grandmother and child had a significant relationship. It stated:

> And [Father's expert, Mr. McGee] based his opinion solely on or what appeared to be on a quality of the interaction versus the length of the interaction.
>
> And while the Court was concerned with some of that testimony because in all of the testimony that I've ever heard about -- or all of the information that I've ever heard or known about attachment disorder, reactive attachment disorder that there is a significant relationship that occurs between individuals who have an emotional connection to children and that that is not necessarily based on the amount of time that is spent but is based on the emotional connection between the adult and the child as well as the amount of time spent.

At the hearing, the district court questioned Mr. McGee on the "reactive attachment disorder" theory. The extent of their exchange was:

> THE COURT: . . . And the reason I'm asking these questions is because of information I've learned over the years about reactive attachment disorder, how early that happens. The importance of not just the amount of time but also the emotional connection.
>
> THE WITNESS: Um-hum.
>
> THE COURT: And so that's what I'm -- that's what I'm wondering about. And I'm asking if that additional time, if the fact that this is a grandmother who I think the evidence is loved and cared about this child, if that has any impact on your opinions?
>
> THE WITNESS: It doesn't when it comes to the quality of it, simply because if -- if a grandparent, for instance, was going to become the primary caregiver, then those things would matter more. But if -- if it begins to erode the trust that a child has in the parent, then I think it comes down to the cost benefit.
>
> A child may enjoy time or connect with a grandparent, but if that relationship begins to erode the confidence in their parent, who is their primary caregiver, then it has an overall negative effect on the child.

There was no other testimony or evidence on the subject of "reactive attachment disorder." It was improper for the district court to rely on its own understanding of the disorder when that evidence was not contained in the record. *See Price v. State ex rel. Dep't of Workforce Servs., Workers' Comp. Div.*, 2017 WY 16, ¶ 15, 388 P.3d 786, 792 (Wyo. 2017) ("However, the Commission is not free to provide its own version of the facts or to supplement the facts with evidence that is not contained in the record. It was improper for the Commission to do so here. We agree that the Commission acted in excess of its authority when it relied upon its own expert opinions and facts that were not in the record."); W.R.E. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); *see also* 31A C.J.S. *Evidence* § 142, Westlaw (database updated May 2025) ("[C]ourts cannot indulge in arbitrary deductions from scientific laws as applied to the evidence except where the conclusions reached are so irrefutable that no room is left for the entertainment by reasonable minds of any other conclusion."); *Prestige Homes, Inc. v. Legouffe*, 658 P.2d 850, 854 (Colo. 1983) ("To accept the court's substitution of its own fact findings for those of the referee in this instance

[¶18] The Court found:

> The evidence that establishes [Grandmother's relationship with the child] is that [she] had consistent and significant visits with the child and, granted, this is during the first year of the child's life. She went to the hospital when her daughter went into labor. She held the baby right after the birth. She saw the baby every Sunday at the family dinner. The testimony was that she spent that time playing with the baby. She saw the baby on some Saturday mornings with her daughter and her mother. She saw the baby when her daughter would bring the baby to her mother's house for visits. She watched the baby when her daughter was working and when his father went to Colorado. She took time off of work to babysit the baby during some of those occasions. She saw the baby at his birthday and other family gatherings. And she watched the baby overnight on at least two occasions.

Grandmother offered no evidence that Father's decision to discontinue ALG's visitation with her would harm ALG. She presented no expert testimony regarding harm. Her testimony was limited to her history and relationship with the child. The only evidence in the record concerning harm came from Father's proffered expert. He testified that visitation with Grandmother would likely harm ALG so long as the relationship between Grandmother and Father remained hostile. The district court referred to this evidence in its ruling: "I did find persuasive . . . the concern expressed about [Grandmother's] feelings about [Father] and how that translates to the child. The Court does have concerns about that." Despite those concerns, it ordered Grandmother have visitation with ALG. Because there was no evidence that Father's decision to restrict visitation harmed ALG, the district court clearly erred when it concluded otherwise and awarded visitation to Grandmother.[7]

---

would expand the judicial notice rule far beyond its intended scope. . . . 'Courts cannot indulge in arbitrary deductions from scientific laws as applied to evidence except where the conclusions reached are so irrefutable that no room is left for the entertainment by reasonable minds of any other conclusion.'" (citations omitted)).

[7] We also note the district court did not conduct a best interests analysis, and it made no best interest findings. *See Bowman*, ¶ 13, 519 P.3d at 989; *Ailport*, ¶¶ 21, 30, 507 P.3d at 437, 439 (once grandparent establishes "the parents are unfit or their visitation decision is harmful to the child[ren,]" the "presumption in favor of parental decision making [is] overcome"); *Bowman*, ¶ 13, 519 P.3d at 989 (and the court may then "consider what visitation would serve the children's best interests"); Wyo. Stat. Ann. § 20-7-101(a) (if visitation is in "the best interest of the child and that the rights of the child's parents are not substantially impaired, the court shall grant reasonable visitation" to the grandparent).

## CONCLUSION

[¶19]   The district court clearly erred when it found Grandmother established by clear and convincing evidence that Father's visitation decision harmed ALG.   Accordingly, the district court violated Father's constitutional rights as a parent when it established grandparent visitation pursuant to Wyo. Stat. Ann. § 20-7-101.   Reversed.